**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | | |
|---|---|---|
| **KEN OLSEN, JEFF BREGMAN, CHUCK TRAMONTOZZI and JUSTEN LESLIE,** | : | Civil Action No.: |
| | : | |
| | : | |
| **Plaintiffs,** | : | **CLASS ACTION** |
| | : | **COMPLAINT** |
| **v.** | : | |
| | : | |
| **CHARTER COMMUNICATIONS, INC.,** | : | **DEMAND FOR JURY** |
| **CHARTER COMMUNICATIONS** | : | **TRIAL** |
| **HOLDINGS LLC and SPECTRUM** | : | |
| **MANAGEMENT HOLDING COMPANY** | : | |
| **LLC (f/k/a TIME WARNER CABLE, INC.),** | : | |
| | : | |
| **Defendants.** | : | |

---

Plaintiffs Ken Olsen, Jeff Bregman, Chuck Tramontozzi and Justen Leslie (the "Plaintiffs") bring this action to seek relief for themselves and over one million other business (*i.e.* non-residential) customers of Time Warner Cable and its successor, "Spectrum," for breach of agreement and past and ongoing unfair business practices which have violated and continue to violate the laws of the States in which Defendants provided internet services to Plaintiffs and class members against Defendants Charter Communications, Inc. ("Charter"), Charter Communications Holdings LLC ("CCH") and Spectrum Management Holding Company LLC, formerly known as "Time Warner Cable" ("Spectrum-TWC") (and collectively with Charter, "Defendants").

Plaintiffs make the allegations herein based on the investigation of their counsel, review of reports filed with the Securities and Exchange Commission, publicly available reviews of internet service providers and excerpts of evidence obtained by the New York

State Attorney General after over a yearlong investigation of Time Warner Cable, Spectrum and Charter Communications.

## I.  SUMMARY OF THE CLAIMS

1.     For years and continuing through the present day, Defendants have misled their business customers by promising to deliver Internet service at speeds that they knew they could not deliver due to the limitations of their equipment and infrastructure.  Nonetheless, Defendants continued to change Plaintiffs and the other class members for services and equipment leases that could not deliver the promised speeds.  Those failures constituted a breach of the business customer's agreement between Defendants and customer and violated the laws of over 35 states where Defendants offered internet service to business customers.

2.     Business customers of the Defendants, like all businesses today depend on internet service to run their businesses.  According to the FCC in a 2015 report:

> Access to robust broadband service is a necessity in today's world
> for jobs, educations, civic engagement and economic
> competitiveness.

3.     Defendants need only to have consulted "YELP" reviews from 2013 through the present to understand that their business customers throughout the country have been complaining about internet speeds that were far less than the Defendants had promised, including in Kentucky, Texas, California, New York, Florida, North Carolina, Georgia, Nebraska and Wisconsin. In 2014, Consumer Reports rated services for the Time Warner Cable were "57", "Poor Value, Fair Reliability, Fair Speed", http://www.consumerreports.org/CRO/electrmics-computers/computers-internet/telcom-services/internet -services-ratings/ratings-overview.ltm

4.     Complaints poured in from all over the country, to *inter alia*, on-line sites such as "DSL Reports" as customers from,  inter alia, the states of Texas and New York where Spectrum

has a large customer base, complained of not getting internet speeds they were promised and had paid for. In New York State alone, the New York Attorney General received over 2800 reports from subscribers who complained about Defendants' internet service.

5.    Defendants promised that customers could obtain high Internet speeds as advertised in Defendants' various subscription plans. But Defendant knew that such speeds could not be delivered to consumers for three reasons which Defendants could, but chose not to, remediate. First, Defendants failed and refused to provide customers with modems that could support the promised internet speeds. Second, Defendants knew they could not provide an appropriate wireless router to deliver the promised speeds. Third, Defendants knew that their network and infrastructure could not deliver the promised speeds.

6.    Prior to Charter's acquisition of Time Warner Cable's assets and subscribers, Time Warner was in the process of upgrading its internet service, after the merger Charter ceased all activity in the Time Warner Cable MAXX upgrade program. The "hold" on upgrade efforts was attributed by Charter executives to a desire to cut costs at the combined companies. Even where implemented however, the MAXX Upgrade did not enable Defendants to deliver the internet speeds customers were paying for.

7.    Defendants' infrastructure limitations caused customers to be unable to achieve the "fast, reliable Internet speeds" Defendants emphasized in their advertising campaigns even if Defendants had provided them with adequate equipment. These limitations also prevented Defendants from fulfilling their promises of providing Internet service at high speeds that are "fast" with "no buffering," "no slowdowns," "no lag," "without interruptions," "without downtime," and "without the wait."

3

8.      Defendants continued their Internet advertising promotions despite knowing their equipment and infrastructure could not provide the advertised service.  Defendants paid bonuses to sales personnel who sold the higher-speed, higher-priced plans to customers.  Defendants charged high fees for high internet speed services and monthly lease charges but would not invest in equipment and infrastructure to deliver consistently high Internet speeds.

9.      Customers who paid for an internet service plan that promised to provide Internet speeds of at least 20 megabits per second (mbps) but were leased modems incapable of consistently achieving such speeds were knowingly overcharged by Defendants.  Customers who paid for an internet service plan that promised to provide internet speeds of 100 mbps (and up to 300 mbps) but were leased wireless routers incapable of consistently achieving such speeds were likewise knowingly overcharged by Defendants.

10.      Moreover, due to Defendants' poor infrastructure and parsimonious management of their networks, even newer generation modems and wireless routers provided by Defendants still could not consistently achieve the promised Internet speeds.  Instead, Defendants overloaded the same "service group" (industry nomenclature for a group of subscribers who share the bandwidth of a cable line connecting that group, usually in close proximity to each other and to Spectrum-TWC's central facilities) and provided too few channels for such subscribers, thus causing an Internet "traffic jam" (particularly during peak hours) that slowed every subscriber's connection to speeds substantially below what was promised and paid-for.  The same experience occurred even while customers used wireless routers.

11.      Defendants' business practices during the relevant time period have been, and continue to be, in violation of their agreement with business customers and constitute violations of the state's laws in which they operate.  Defendants acted knowingly and intentionally in

pursuing these wrongful business practices, and they pocketed millions of dollars of windfall profits at the expenses of customers.

12.    Plaintiffs, individually and on behalf of similarly situated business customers nationwide, now seek the full measures of damages, restitution, necessary to remedy the harm they have suffered as a result of Defendants' wrongful business practices, and to punish Defendants for their misconduct.

## II.    JURISDICTION AND VENUE

13.    This Court has jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d) and 1453, because the amount put in controversy by this class action exceeds $5,000,000, there are more than 100 proposed class members, and at least one member of the proposed class and one of the Defendants are citizens of different states (CAFA jurisdiction).

14.    This Court has personal jurisdiction over all Defendants because Defendants' operate a large portion of their broadband operations out of New York City, including the former Time Warner Cable operations.

15.    Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1) and (2) because Defendants have a significant presence in New York.

## II.    PARTIES

### A.    Plaintiffs

16.    Plaintiff Ken Olson ("KO") is an individual and citizen of Wisconsin, at all times relevant to this lawsuit.  KO signed up and paid for Defendants' business Internet services and was harmed by Defendants' breach of service terms, false representations and other wrongful business practices.

17.     Plaintiff Jeff Bregman ("JB") is an individual and citizen of California, at all times relevant to this lawsuit.  JB signed up and paid for Defendants' business Internet services and was harmed by Defendants' breach of service terms, false representations and other wrongful business practices.

18.     Plaintiff Chuck Tramontozzi ("CT") is an individual and citizen of Texas, at all times relevant to this lawsuit.  CT signed up and paid for Defendants' business Internet services and was harmed by Defendants' breach of service terms, false representations and other wrongful business practices.

19.     Plaintiff Justen Leslie ("JL") is an individual and citizen of New York, at all times relevant to this lawsuit.  JL signed up and paid for Defendants' business Internet services and was harmed by Defendants' breach of service terms, false representations and other wrongful business practices.

**B.     Defendants**

20.     Defendant Spectrum Management Holding Company LLC is a Delaware LLC ("Spectrum Holding") with its principal place of business at 60 Columbus Circle, 17th Floor, New York, New York 10023 and is 88% owned by Charter Communications, Inc. with the balance owned by Advance/Newhouse Partnership.  Time Warner Cable was merged into Spectrum Holding at the time of the Merger.

21.     Defendant Charter Communications, Inc. ("Charter") is a Delaware corporation headquartered in Stamford, Connecticut.  Charter, together with its subsidiaries, (among which we the Defendants listed below) is now the second-largest cable operator and internet service provider in the United States with over 25 million subscribers, in 41 states.  Prior to its May 18,

2016 merger with Time Warner Cable, Inc., Charter was a much smaller company, with only 6.7 million cable subscribers.

22.     Defendant Charter Communications Holding LLC ("CCH") is a Delaware corporation with its principal place of business at 400 Atlantic Street, Stamford, Connecticut 06901.  Spectrum Holding is the owner of CCH.

23.     Charter provides internet services nationwide indirectly through Spectrum Holding and CCH.  All Defendants are referred to collectively herein as "Charter" or "Spectrum-TWC."

## III.    CLASS ACTION ALLEGATIONS

24.     Plaintiffs bring this case as a proposed nationwide class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of all members of the following Class and Subclasses.  Plaintiffs reserve the right to amend the following definitions before the Court determines whether class certification is appropriate or thereafter upon leave of Court.

<u>**Proposed Class**</u>

> All TWC and/or Spectrum business customers in Alabama, Arizona, California, Colorado, Hawaii, Idaho, Indiana, Kansas, Kentucky, Massachusetts, Maine, Missouri, Nebraska, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, Pennsylvania, Texas, Virginia and Wisconsin ("Class States") from no earlier than October, 2012 through the present (but not for a class period longer than any applicable state law claims) ("Class Period") who paid for a business or commercial Internet service plan and modem or wireless router offered by Defendants at any time within the relevant time period.

25.     Excluded from the proposed Class and Subclasses are Defendants and their parents, subsidiaries, affiliates, officers, directors, and current and former employees; all individuals and businesses who make a timely election to be excluded from this proceeding using

the correct opt-out protocol; any and all federal, state or local governments, including but not limited to their departments, agencies, divisors, bureaus, boards, sections, groups, counsel, and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

26.    **Numerosity**. The member of the proposed Class and Subclasses are so numerous that joinder is impracticable. Over a million Spectrum business customers throughout the United States have contracted with Defendants for services that have not been provided and have been victims of Defendants' representations concerning Internet speed, have purchased Internet service plans during the relevant period, and therefore have been subjected to and harmed by Defendants' unlawful acts. The number and identity of individuals who fall within the proposed Class and Subclass definitions are easily identifiable and ascertainable based on Defendants' business records.

27.    **Commonality and Predominance.** Common questions of law or fact that with drive the resolution of this case include, but are not limited to:

   a.  Whether Defendants' breached the "Commercial Services Terms and Conditions" applicable to business customers by failing to use commercially reasonable efforts to provide the contracted for service and equipment.

   b.  Whether Defendants' false, misleading, untrue, or unfair statements in their advertisements related to Internet speeds and reliability violated the state laws enumerated herein.

   c.  Whether Defendants violated the state laws enumerated herein by renting them obsolete equipment, modems, wireless routers, and related equipment which were

incapable of consistently supporting the Internet speeds being advertised and purchased; and

d.  Whether Defendants violated the state laws enumerated herein by charging customers for internet speeds which Defendants' knew they could not deliver due to the network and infrastructure deficiencies and obsolete equipment which, Defendants knew, prevented them from consistently providing the Internet speeds and reliability promised in Defendants' advertisements.

28.  In addition to the common question of law and the fact that will drive this case, Defendants engaged in common course of conduct giving rise to violations of the legal rights sought to be enforced by Plaintiffs and proposed Class members. Similar or identical to statutory and common law violations, business practices, and injuries are involved in this case and are applicable to Plaintiffs and most, if not all, of the proposed Class and subclass members. Any individual questions that may arise in the class will pale in comparison to the numerous common questions.

29.  **Typicality.** Plaintiffs' claims are typical of the proposed Class and Subclass members' claims because:

a.  Plaintiff and proposed Class members are harmed by Defendants' practice of leasing modems, wireless routers, and related equipment that could not support the Internet speeds being advertised and promised;

b.  Plaintiff and proposed Class members, by being unable to consistently achieve the promised Internet speeds and reliability, are prevented from obtaining the full promised value of their internet services plans;

    c.   Plaintiffs and proposed Class members are subject to Defendants' uniform terms of agreement, policies and disclosures; and

    d.   Plaintiffs' and proposed Class members' injuries flow from a common nucleus of operative facts, can be determined from Defendants' business records, and can be calculated in and identical or substantially similar manner.

30.    Giving the similar nature of the Plaintiffs' and proposed Class members' claims and given the absence of material differences in the relevant statues and common laws on which the claims are based, a nationwide Class and various Subclasses may be easily managed by the Court and the parties.

31.    **Adequacy of Representation**. Plaintiffs will fairly and adequately protect the interest of all proposed Class and Subclass members. Moreover, Plaintiffs have retained counsel experienced in complex commercial litigation and consumer class actions, and Plaintiffs and their counsel intend to prosecute this action vigorously. Plaintiffs have no interests that are adverse to antagonistic to those of the Class members. Plaintiffs' claims are typical of Class members' claims, and all Class members have been similarly affected by Defendants' unlawful conduct.

32.    **Ascertainability**.  Defendants sell Internet service plans to business customers who are billed monthly and have collected detailed contact information associated with each class member.  Accordingly, the precise number and identify of Class and Subclass members can easily be determined by reference to Defendants' business records.  As such, Class and Subclass members are easily ascertainable and can be personally notified of the pendency of this action by first class mail, email, and/or published notice calculated to reach all such members.

33.    **Superiority of a Class Action.**  The proposed Class and each of the proposed Subclasses should be certified pursuant to Rule 23 of the Federal Rules of Civil Procedure because:

  a. Prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudication with respect to individual Class members that would establish incompatible standards of conduct for Defendants;

  b. Prosecution of separate actions by individual Class members would create a risk of adjudications that would, as a practical matter, be dispositive of the interests of other Class members who are not parties to the adjudications, or would substantially impair or impede their ability to protect their interests;

  c. Individualized litigation would increase the delay and expense to all parties and the court system from the issues raised by this action; by contrast, the class action procedure provides the benefits of adjudicating these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and its presents no unusual management difficulties;

  d. Because of the relatively small size of the individual Class members' claims, no Class member could afford to seek legal redress on an individual basis, making the class action procedure superior to alternative means of prosecution; and

  e. Defendants have acted and failed to act on grounds generally applicable to Plaintiffs and Class members, thereby supporting the imposition of uniform relief to ensure compatible standards of conduct toward all Class members.

34.     Plaintiffs and other Class members have been or are likely to be injured as a result of these representations.

35.     Plaintiffs, individually and on behalf of all Class members similarly situated, seek any necessary orders or judgments that will prevent Defendants from continuing with their false and misleading representations, including but not limited to an order requiring service modifications, equipment replacement, corrective advertising and restitution.  Plaintiffs also seek disgorgement of Defendants' profits, an award of all damages suffered, an award of the costs of the action, treble damages, and attorneys' fees.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Background

36.     By at least October 1, 2012, Spectrum-TWC was engaged in aggressive marketing of its high priced (allegedly) high speed internet service subscriptions to business customers.

37.     According to the investigation of the New York State Attorney General, an internal presentation at Time Warner Cable explained that a key "strategic pillar" for Spectrum-TWC was to "capture premium pricing" and "drive migration to higher tiers."  "Premium pricing" was keyed to (alleged) higher internet speeds.

38.     Defendants offered different levels of service to its business customers including services promising internet download speeds of 50 Mpbs, 100 Mbps, 200 Mbps and 300 Mbps. Business customers' plans were priced based on the internet speeds promised.

39.     After the merger, Spectrum's business customer segment services had 1,358,000 internet customers in 40 states. (Prior thereto TWC served 752,000 business customers)  Its business customers' average "Revenue per customer" is $207.36 per month as of December 31,

2017 as compared to average revenue per residential customer of $109.75 per month. Business services were TWC's fastest growing segment with revenues growing at approximately 19% annual average from 2013 through 2015 while residential revenues grew at only approximately 1 ½% per year over the similar period. Moreover, for the same period, TWC's operating margins for its business revenue segment was approximately 69% while residential revenue operating margins were approximately 40% and declining.

### B. Defendants' Marketing And Promotions Knowingly Promised More Than Defendants Could Deliver

40.     Defendants represented that they could provide consistent download speeds of up to 300 Mbps in Alabama, Arizona, California, Hawaii, Illinois, Indiana, Kentucky, Michigan, Missouri, New Hampshire, New Jersey, New York, North Carolina, Ohio, South Carolina, Tennessee, Texas, Virginia and Wisconsin. Defendants represented that they could provide consistent download speeds of up to 100 Mbps in Colorado, Idaho, Massachusetts, Nebraska and New Mexico. But throughout the country, Defendants represented that they could provide consistent download speeds of at least 20 Mbps to business customers.

41.     During the Relevant Period, Spectrum-TWC's television, Internet, print and direct mail advertisements focused on the consistent delivery of promised speeds on multiple devices.

42.     Spectrum-TWC's advertising led subscribers to believe that the Internet speed on the high-speed plans offered high speed, superior quality service. A 2012 Spectrum-TWC direct mailing promised that subscribers would get "Faster, reliable Internet speeds."

43.     Spectrum-TWC advertised its high-speed plans with adjectives like "Turbo," "Extreme," and "Ultimate," to convey the benefits of choosing them over cheaper plans which advertised slower speeds. Spectrum-TWC reinforced the impression that subscribers would experience the promised speeds any time they used the Internet by pairing the numerical speed

promises in its advertising with promises of "consistently" fast or "reliable" Internet service.

44.     In a 2013 mailing, a Spectrum-TWC touted false representation of its infra

structure and promised subscribers that "[o]ur network is built to handle all of your activities,

**without any slowdowns**.  Whether you're just checking email or downloading a whole album of

photos, our network won't let you down."  (Emphasis added.)

45.     In 2012 and 2013, Spectrum-TWC pegged its "standard" plan at 15 Mbps and

offered high-speed plans of 20, 30 and 50 Mbps.  In 2014, the Defendants offered higher speed

plans for subscribers as part of its MAXX upgrade program, creating new high speed plans that

offered 100, 200 and 300 Mbps.

46.     Spectrum-TWC marketed this purported equivalence of wired and wireless

connections as a feature of its 50 Mbps plans, telling subscribers in a 2013 mailing that, with

Spectrum-TWC's wireless routers, the internet services would flow – "**without slowdowns**."

(Emphasis added.)

47.     In 2013, Spectrum-TWC ran a television commercial called "The Test," that

showed its employees testing the wireless speeds achieved on a smartphone and a tablet across a

large room buzzing with computers and interference.  The employees gleefully exclaim, "tablet:

running at 50 [Mbps], "smartphone: lightning fast," and "Our fiber-rich network is crushing it!"

The terminal screen in front of one Spectrum-TWC employee showed the results of a "dual

speed test" that indicated both wireless devices had *simultaneously* nearly identical speeds of

about 50 Mbps.

48.     In a 2014 television commercial, Spectrum-TWC introduced a 300 Mbps

"Ultimate Internet" plan while the voice-over heralded "a new dimension of *reliability* and a

revolution in *velocity* essential for today's online life."

49.    In early 2014, Time Warner Cable announced its "TWC MAXX" upgrade in New York, Texas and California with promises of internet download speeds of 300 Mbps.  In July 2015, Time Warner Cable announced its MAXX Service in North Carolina.  By early 2015, Time Warner was marketing it MAXX Service in Kansas and Hawaii also.  As part of the MAXX upgrade, Spectrum-TWC marketed some of the highest Internet speeds advertised in the country – 100, 200, and 300 Mbps.  Through the MAXX upgrade, Spectrum-TWC led subscribers with D2 modems to believe that it was offering faster Internet speeds of 50 Mbps to 300 Mbps priced from $49.99 to $109.99 in an effort to convince such subscribers to stay with Spectrum-TWC and not switch to another ISP.  Because the plans with the faster speeds were more expensive for subscribers, Spectrum- TWC tried to convince as many subscribers as possible to sign up for these high-speed plans as part of its plan to grow revenue.

50.    In another television ad touting its 300 Mbps plan that aired in 2016, an actor exclaimed "I didn't know your home WiFi could stream so many devices at the same time!" while the neighbor's son explains, "Dad, it's Time Warner Cable 300 [Mbps].  Crazy fast!"

51.    In these ways, Spectrum-TWC advertisements during the Class Period gave subscribers the impression that they needed more speed to enjoy Internet content and that Spectrum-TWC would deliver those promised speeds to them on any device in their home regardless of whether they used a wired or wireless connection.

52.    Spectrum-TWC understood these characteristics were important to subscribers.  A 2015 Spectrum-TWC internal presentation titled "Key trends and imperatives for TWC Internet" explained that: (a) new technologies and people increasingly working from home "drive ever-expanding bandwidth needs"; (b) new subscribers are "increasingly citing reliability, along with speed, as reasons to switch ISPs" and that existing subscribers rate "connectivity and reliability

15

as most important aspects of their Internet service"; and (c) Spectrum-TWC "cannot compete on speed & reliability alone and must distinguish its Internet offering by promising connectivity everywhere with no dead spots."

53.    Spectrum-TWC's training materials instructed employees to tell subscribers that Spectrum-TWC's modem lease program "ensures that you always have the right modem in your home to meet the ever-changing needs of technology." Spectrum-TWC provided incentives to its customer service representatives to persuade subscribers to sign up for high-speed plans by tying the compensation of the customer service representatives to the monthly revenue generated from subscriptions to these high-speed plans.

### C.    Internally, Defendants Acknowledged They Could Not Deliver The Internet Services Being Advertised

54.    During the Class Period, Spectrum-TWG leased older-generation wireless routers and modems to subscribers nationwide who had subscribed to plans promising speeds of 50, 100, 200 and 300 Mbps.

55.    In October 2012, Spectrum-TWC started to charge subscribers a monthly lease fee for "gateway" devices that included modems and/or wireless routers. The monthly fee was as high as $11.75 per month. Although Spectrum-TWC allowed subscribers to use their own modems, the vast majority of subscribers opted to pay a monthly lease fee for the use of a Spectrum-TWC-supplied modem, usually as part of a gateway device that also included a wireless router. According to TWC PR Director Judy Barbaro, the percentage of subscribers who bought their own modem was in the "single digits" in 2013.

56.    As early as 2012, Defendants had determined that D-1 modems should no longer be deployed on any speed plan.

57.    In connection with its modem lease program, Spectrum-TWC promised

subscribers that it would provide them with "the appropriate modem for your Internet service plan and speed tier."  Spectrum-TWC also promised that it would upgrade leased equipment "at no additional cost if we update Internet plan speeds and when technology improves."

58.    Similarly, Spectrum-TWC promised subscribers with "D1" and "D2" modems on the old "Standard" 15 Mbps tier that they would get 50 Mbps, even though Spectrum-TWC knew that those subscribers could never achieve that speed with their deficient "D1" and "D2" modems.  It represented that the modems and routers would be appropriate for the customers' speed plan and that it would upgrade the devices at no charge.

The DOCSIS 1.0 Standard (Data Over Cable Services Interface Spectrums) ("D1")was released in March 1997 but was superseded in 2002 by the DOCSIS 2.0 ("D2")which allowed maximum doubled speeds of only 40 mbps. DOCSIS 3.0 was released in August 2006 with maximum download speeds of 1.2 gbps and was superseded by DOCSIS 3.1 in 2013 with a maximum download speed of 10 gbps. Although Time Warner Cable was one of the contributing developers of DOCSIS ( with CableLabs), TWC did not deploy to its customers the very equipment it helped develop. During the Class Period, TWC was leasing 13-15 year old technology to its business customers even though, by 2013, the DOCSIS 3 had been available since 2006.

59.    In making such claims, Spectrum- TWC represented that it would provide subscribers with a modem that could support the Internet speeds of their plans and that it would upgrade the modem at no additional charge as Internet speeds increased.

60.    Even absent such explicit assurances, a subscriber leasing a modem directly from Spectrum-TWC would expect that the modem would be able to support the Internet speeds promised in Spectrum-TWC's ads and the speed plan for which she paid.

61.    The company promised its subscribers that these modems would allow them to achieve the Internet speeds they had paid for, and that Spectrum-TWC would upgrade the modems at no additional charge as Internet speeds increased.  However, Spectrum-TWC knew that, in practice, these older-generation modems were incapable of achieving the Internet speeds its subscribers were led to believe they were paying for.

62.    In early 2013, in connection with the Internet speed tests administered by the Federal Communications Commission ("FCC"), Spectrum-TWC determined that its older-generation modems were incapable of reliably achieving speeds of even 20 Mbps. Since TWC was delivering speeds of less than 25 Mbps it could not even meet the FCC's definition of "broadband". To avoid costs, Spectrum-TWC failed to replace these older-generation modems with the new-generation modems for subscribers who paid for plans that promised speeds of 20 Mbps and above.  Instead, Spectrum-TWC continued to charge those subscribers for higher-speed plans that the company knew their modems could not deliver.

63.    A June 2013 consulting study commissioned by TWC that recommended it offer higher speeds to retain subscribers, acknowledged that implementing that recommendation would require replacing all the deficient single-channel modems.  The June 2013 study explained that "increasing speed can offset sub[scriber] losses from price increases and increase overall revenue" and that "[i]ncreasing speed with no price increase produces sub[scriber] gains."

64.    Because Spectrum-TWC did not undertake to proactively replace subscribers' deficient, single-channel modems, it knew it was not actually delivering these faster Internet speeds. Under the MAXX upgrade plan, Spectrum-TWC promised speeds of 100 Mbps to subscribers who were on the old "Turbo" 20 Mbps tier with D2 modems that its own analysis

showed delivered less than 10 Mbps during peak hours.

65.    To conceal this failure, Spectrum-TWC assured the FCC in or about July 2013, that it would replace its older-generation modems for *all* of its subscribers, but in fact it did not. The FCC relied on that commitment to exclude the poor results of the speed tests on those modems in the FCC's subsequent public reports. Had these modems' results been included in the FCC's testing program, they would have revealed Spectrum-TWC's deceptive practices.

66.    Based on several Internets Speed tests, including those run by the FCC, subscribers on the 300 Mbps plan generally received only, 10% to 70% of the promised speed; subscribers on the 200 Mbps plan received only 14% to 60% of the promised speed; and subscribers on the 100 Mbps plan received only 24% to 87% of the promised speed.

67.    In 2013, Spectrum-TWC determined that D2 modems were "non-compliant" for speeds of 20 Mbps or higher for the simple reason that they were incapable of delivering speeds of 20 Mbps or higher. Instead of replacing modems as promised, Spectrum-TWC continued to charge subscribers for plans that promised Internet speeds of 20 Mbps and higher.

68.    Even though Spectrum-TWC knew that each of the subscribers who leased older-generation, single-channel D1 and D2 modems would not achieve the promised Internet speeds, Spectrum-TWC nonetheless continued to charge these subscribers for more expensive high-speed plans than their modems could support.

69.    The widespread distribution of deficient modems among Spectrum-TWC subscribers was the result of Spectrum-TWC's deliberate strategy of placing its own business interests ahead of its obligation to fulfill the express promises it made to its subscribers.

70.    In February 2013, after determining that the older-generation, single- channel D2 modems were incapable of delivering the promised speeds, Spectrum-TWC deemed such modems to be "non-compliant," and its engineers recommended replacing such modems, stating that "[w]e need the right modems in place and the network needs to be provisioned correctly. There's no silver bullet."

71.    An internal Spectrum-TWC presentation from June 2013 observed that 75% of the modems associated with the 20 Mbps plan across the country were non- compliant, but "D2 modems are still being deployed due to budget restraints." This presentation went on to note that because D2 modem replacement was beyond the company's "capital ability," "[n]o communications have been sent to the existing customer base with D2 modems to swap out their devices." The presentation also warned, presciently as it turned out, that "recycling D2 modems to support lower tiers would make them vulnerable to underperform with the next speed increase (specifically in the Standard Tier)." The presentation issued a specific recommendation: "Swap non-compliant modems to improve the performance of this tier [i.e., the 20 Mbps tier]."

72.    For example, in a September 30, 2014 email, a senior customer service representative explained to other Spectrum-TWC executive, "[w]e are getting ton of service calls in regards to slow wireless speeds, these customers have 300 down and only getting 50 down on wireless." The representative continued: "[c]ustomer expectation vs. actual results is what we are trying to get some clarity on. Customers are paying for 300 down and they are expecting wireless to be close."

73. Spectrum-TWC's former Vice President of Customer Equipment observed in an October 6, 2014 internal email to senior colleagues that "we do not offer a [device] today that is capable of the peak MAXX speed of 300 Mbps via wireless."

74. During the early MAXX rollout in 2014, Spectrum-TWC experimented with a plan it called "Ship to All" that sent new D3 modems to all subscribers with deficient modems at no charge, or offered to have a professional install such a modem. In April 2014, however, Spectrum-TWC rejected the "Ship to All" plan as too expensive.

75. Instead, Spectrum-TWC devised a strategy with the opposite objective: to minimize the number of deficient modems Spectrum-TWC would replace. Known internally as the "Raise Your Hand" plan, this strategy required subscribers to go through several bureaucratic steps to receive and install the modem appropriate for their speed plans. Spectrum-TWC required subscribers to request a new replacement modem by contacting customer service, which would have subjected the subscriber to notoriously long hold times, or lost time spent visiting a service center in-person. Spectrum-TWC's notice to subscribers telling them about the opportunity to get a new D3 modem failed to explain that retaining an existing D2 modem could result in getting only one-tenth or less of the promised speeds.

76. Even in instances where the deficient D2 modem had been professionally installed, Spectrum-TWC required subscribers to personally install the replacement D3 modem or pay a fee to have it installed by a technician.

77. Finally, Spectrum-TWC required subscribers to return the old D2 modems or face a large "unreturned equipment fee" as a penalty. This requirement was particularly egregious since at this point, D2 modems were considered to be "end of life" by the cable industry and were no longer being deployed by many other ISPs.

78.    Spectrum-TWC premised the "Raise Your Hand" plan explicitly on the company's expectation that large numbers of subscribers would not follow through on the process required to receive a replacement D3 modem.  One senior executive stated clearly in a February 2015 email:  "The solution is to get the D2s out, but we don't have that kind of capital."

79.    Later in 2015, Spectrum-TWC reported internally that the actual "Raise Your Hand response rate in 2014 MAXX markets was 25%."  As a result, Spectrum-TWC spent even less money than it had originally budgeted.

80.    Spectrum-TWC also did not follow the recommendation of one of its engineers to "change [the subscriber's] tier to speed their modem can handle" if the subscriber did not respond to the Raise Your Hand communication.  Instead Spectrum-TWC rolled out a new policy for all subscribers with D2 modems that programmed their D2 modems to cap their speeds at 20 Mbps, but continued to charge them for higher speed plans.

81.    As an example, Spectrum-TWC still charged a subscriber with a D2 modem on the 100 Mbps plan as much as $70 per month, but it actually programmed the D2 modem so that its top speed would never exceed 20 Mbps even during non-peak hours.

82.    Spectrum-TWC's former head of corporate strategy admitted in a February 2015 email that, "the effective speeds we are delivering customers in a 20 Mbps tier when they have a D2.0 modem is meaningfully below 20 Mbps."

83.    At one point, a Spectrum-TWC executive suggested in a February 2015 email that the company needed to lower its 80% peak utilization target to allow subscribers to attain the speeds promised to them.  A co-worker swiftly rejected the suggestion, explaining "I don't necessarily disagree with the logic" but, he continued, "[i]f we make the statement, then we are all saying that . . . we must go to all maxx markets and anything above 50% utilization (16

channels*38mbps=608mbps) **must be mitigated to support 300 Mbps tier and that would drive 100's of millions in investment**. . . ."  (Emphasis added).

84.     As a Spectrum-WC engineer explained in a March 2015 email, the company's network utilization targets would result in subscribers using the single- channel modems to routinely experience speeds below 10 Mbps during peak hours:

> [A] single channel modem MUST be able to achieve its provisioned speed during peak usage (when customers are using the service) which would be in the neighborhood of 80% utilization. It doesn't matter if a modem "could" achieve the speed, it really only matters when they are most commonly using it. Therefore, given the data, we need to severely limit single channel modems to <10 mbps or so.

(Emphasis added.)

85.     This conclusion was repeated in Spectrum-TWC's February 3, 2016 letter to the OAG that admitted: "[a]chieving broadband download speeds of 20 Mbps and above requires a [D3] modem."

86.     Spectrum-TWC also made specific representations in its commercials about the quality and performance of the wireless routers it leased to its customers.  As with modems, most subscribers leased a wireless router directly from Spectrum-TWC as a component of a gateway device that included both a modem and a router.

87.     Spectrum-TWC expressly promised that leasing such wireless routers from the company would guarantee subscribers had the appropriate equipment as speeds increased and technology improved.  For example, one television commercial from 2015 promised that Spectrum-TWC's home wireless connection would be "powered by the latest equipment available, to cover all your devices."

23

88.    Spectrum-TWC knew that its advertising reinforced subscribers' expectations that they would experience the same Internet speed regardless of whether they connected through a wired connection or a wireless router.  Spectrum-TWC also instructed its customer service representatives to reiterate the same false advertising claims with little or no qualification when interacting with subscribers.

89.    A Frequently Asked Questions (FAQ) guide for Spectrum-TWC customer service representatives, which was current as of February 2016, provided the following demonstrably false guidance:

- *Question:* "Will Wireless Home Networking     affect the speed of my connection on any of my     computers?"

- *Answer:* "Under normal usage, with a maximum          number of computers on the network, the speed of          your Internet connection should not be affected."

- *Question:* "What is the range of the wireless cable    modem?"

- *Answer:* "In 'real-world' testing, users were able to connect from as far as 150 feet away - more than enough range to connect from just about anywhere in your home."

- *Question:* "How will multiple users affect the speed of my Internet cable modem?"

- *Answer:* "Under normal usage, the speed of your     Internet connection should not be affected."

90.    **However**, wireless speeds were consistently slower than wired speeds. When multiple devices attempted to simultaneously access a single wireless connection, they shared the available bandwidth. For example, if four devices simultaneously ran a speed test on a 20 Mbps connection, the maximum speed any one device could achieve would be 5 Mbps. Consumer speed test data from thousands of tests run on the popular Speedtest.net website confirmed that Spectrum-TWC subscribers experienced a sharp drop in speeds when connecting wirelessly.

91.    Most of Spectrum-TWC's subscribers accessed the Internet through a wireless connection. Spectrum-TWC assured its subscribers that they would achieve Internet speeds wirelessly that were as fast as their wired speeds. In reality, however, wireless speeds were consistently much slower than wired speeds due to multiple factors, including distance from the wireless router, interference from other electronics and appliances, and the number of devices accessing the wireless router at the same time.

92.    While several variables can affect the maximum speed for a wireless router, an important initial determinant of the speed was the protocol used by the router. The protocols reference a standard known as 802.11 first released in 1997 and amended several times since. The two most recent amendments to the standards are "802.11n" and "802.11ac." In 2014, Spectrum-TWC leased to most of its subscribers on high-speed plans wireless routers that employed the 802.11n standard (the "802.11n wireless routers"). But Spectrum-TWC knew that the 802.11n wireless router could not deliver anywhere close to the promised speeds of the high-speed plans.

93.    In fact, a Spectrum-TWC internal presentation, dated June 12, 2014, recommended that the company deploy devices with newer generation 802.11ac wireless routers

to all subscribers on speed tiers of 200 Mbps or higher because such routers came closer to delivering the promised speed. Spectrum-TWC rejected that recommendation, again for financial reasons. As with modems, Spectrum-TWC continued to lease deficient wireless routers to subscribers to cut costs and boost profits.

94.    In a September 30, 2014 email, a senior customer service representative explained to other Spectrum-TWC executives, "[w]e are getting a ton of service calls in regards to slow wireless speeds, these customers have 300 down and only getting 50 down on wireless." The representative continued: "[c]ustomer expectation vs. actual results is what we are trying to get some clarity on. Customers are paying for 300 down and they are expecting wireless to be close."

95.    Spectrum-TWC's former Vice President of Customer Equipment observed in an October 16, 2014 internal email to senior colleagues that "we do not offer a [device] today that is capable of the peak Maxx speed of 300 Mbps via wireless." He further admitted: "Generally a customer connecting via wireless will receive less than 100 Mbps" using the 802.11n wireless routers that Spectrum-TWC leased to subscribers. (Emphasis added.) As a result, he also observed "we are going to experience a mismatch between what we sell the customer and what they actually measure on their laptop/tablet/etc."

96.    Spectrum-TWC nonetheless persisted with deceptive advertising, even though its executives acknowledged in internal communications that the company's advertising would result in complaints from subscribers confused about why their wireless speeds were much slower than promised.

97.    A separate Spectrum-TWC technical document discussing wireless connectivity, dated January 2015, concluded that "[i]n a real world scenario, most [802.11n] adapters will produce speeds of 50-100 Mbps."

98.    As of February 2016, over 250,000 subscribers, or four out of five Spectrum-TWC subscribers on New York on the 200 and 300 Mbps plans who leased devices from Spectrum-TWC, had 802.lln wireless routers that the company knew could not deliver close to the promised speeds even under ideal circumstances.

99.    Based on consumer speed test data, Spectrum-TWC subscribers experienced much slower speeds when connecting to the Internet using wireless routers. When connecting wirelessly, subscribers on the 300 Mbps plan typically received 15% of the promised speed; subscribers on the 200 Mbps plan received 20% of the promised speed; subscribers on the 100 Mbps plan received 39% of the promised speed; and subscribers on the 50 Mbps plan received 58% of the promised speed.

100.    Despite this knowledge, Spectrum-TWC did not take any steps to inform subscribers on its high-speed plans that the promised speeds were generally not attainable over wireless routers it supplied subscribers. Nor did Spectrum-TWC offer to replace the older-generation wireless routers for existing subscribers with the new-generation wireless routers.

101.    "Overprovisioning" boosted Spectrum-TWC's average speed results in the FCC's speed test measurements and concealed the underlying problems. Spectrum-TWC's manipulation of the FCC test helped the company mask the fact that Spectrum-TWC consistently failed to deliver advertised speeds to most subscribers under typical service group utilization scenarios.

102.    The overprovisioning strategy manipulated the Sam Knows test by padding the test result average with scores from times when a service group was not heavily utilized-either because at the moment the test ran the service group was not congested, or because the service group was not heavily utilized in general-to compensate for the lower scores from service groups that were congested.

103.    Spectrum-TWC's former head of corporate strategy candidly acknowledged the strategic goal in a July 7, 2014 internal email to senior colleagues: "We recommend increasing over-provisioning our modem speeds to around 20% to drive our Sam Knows scores> 100% and then to market that we deliver more than promised speeds."

104.    A 2013 Spectrum-TWC engineering presentation, which predated the decision to overprovision speeds by 20%, bluntly characterized the overprovisioning maneuver as putting "lipstick on a pig." As the presentation explained, overprovisioning masked the widespread deployment of deficient older-generation, single-channel modems, the prevalence of heavily congested service groups and the poor physical health of neighborhood cable lines.

105.    Despite making reliable access to online content a cornerstone of its marketing during much of the Relevant Period, Spectrum-TWC did not maintain sufficient ports in its connections with backbone and content providers to process the ever-increasing volume of online content sought by its subscribers.

106.    During the Class Period, Spectrum-TWC served as a virtual gatekeeper to a subscriber's access to such products and services available on the Internet. Not only did Spectrum-TWC have control over the equipment it leased to a subscriber and the bandwidth it made available to her, Spectrum-TWC also determined whether a subscriber had reliable

access to online content because that content had to travel through Spectrum-TWC's interconnection points and parts with backbone and content providers.

107.    Spectrum-TWC's decision not to install the required port capacity led to its interconnection points routinely becoming over-congested with traffic.

108.    This congestion was the result of Spectrum-TWC's deliberate strategy to use its own subscribers as leverage to extract fees from backbone and content providers.

109.    As a result of this congestion, Spectrum-TWC subscribers faced the slowdowns, buffering, interruptions and other frustrations that Spectrum-TWC's ads specifically promised would not exist when accessing online content, including Netflix, online games and other content featured in Spectrum-TWC's advertising materials.

110.    Spectrum-TWC's actions also contradicted its representations to the FCC in the Code of Conduct it signed in connection with the FCC's testing program. The FCC's Code of Conduct required Spectrum-TWC to "at all times act in good faith" and not do anything "if the intended consequence of such act or omission is to enhance, degrade or tamper with the results of any test." Specifically, the Code of Conduct prohibited the company from "modifying or improving services delivered to any class of subscribers" that was not "consistent with normal business practices."

D.    **Spectrum-TWC's Infrastructure Network**
**Could Not Consistently Deliver Promised Speeds**

111.    Defendants offer its business customers internet service from the same infrastructure it uses to provide service to its residential customers over its hybrid fiber coaxial network.  Spectrum continues its predecessors' business practices of marketing and promoting internet speeds which customers cannot realized due to Spectrum TWC's equipment and infrastructure deficiencies.

112.    Spectrum-TWC groups its service areas into "regional clusters," according to its annual report on file with the SEC.  The regions are managed centrally on a consolidated level.  Accordingly, Defendants services, infrastructure, and marketing are directed and implemented on a nationwide basis.

113.    In an SEC filing in 2018, Charter described the Spectrum-TWC networks:

> Our network includes three key components:  a national backbone, regional/metro networks and a "last-mile" network.  Both our national backbone and regional/metro network components utilize a redundant Internet Protocol ("IP") ring/mesh architecture.  The national backbone component provides connectivity from regional demarcation points to nationally centralized content, connectivity and services.

114.    Subscribers' demand for online content continued to grow exponentially, causing traffic flowing through Spectrum-TWC's interconnection points to grow by 40% or more each year.  To keep up with this exponential growth in traffic, Spectrum-TWC needed to regularly add ports to its interconnection points to meet the growing content demands of its subscribers.

115.     Even for subscribers who had the appropriate modems and wireless routers, Spectrum-TWC failed to deliver the fast Internet service it had promised.

116.    Spectrum-TWC engineers, consistent with the company's advertising, saw their job as delivering a network that should allow "customers to achieve 100% speed attainment regardless of time of day or day of week." If it designed its network correctly, Spectrum-TWC expected subscribers to get "good speed test results . . . at or above our speed tiers" any time they conducted a speed test. But to deliver those speeds, Spectrum-WC had to allocate sufficient bandwidth to each subscriber in a service group – the group of subscribers who share the "last mile" of bandwidth – so that they could achieve the promised speeds. In helping to determine which speeds to offer subscribers, Spectrum-TWC's engineers developed a rule of thumb:  a service group should have enough bandwidth available that any given subscriber could achieve the promised speed offered during peak hours. A graphic in a Spectrum-TWC presentation from August 2015, depicted below, showed that the maximum speed the company offered should be no more than 50% of the service group's total bandwidth because the other 50% is utilized during peak hours.

117.    However, in practice, Spectrum-TWC failed to maintain the bandwidth required for subscribers to consistently experience their promised speeds. Instead of using the 50% threshold recommended by its engineers, Spectrum-TWC allocated resources to increase the bandwidth available to a subscriber- either through splitting service groups or adding more channels – only after a service group used about 80% of its shared bandwidth during peak hours. Thus, subscribers on the 200 Mbps or 300 Mbps tiers who attempted to use their full bandwidth would achieve speeds that were only a half to a third of their promised speeds.

118.    Spectrum-TWC could have delivered the promised speeds either by reducing the size of service groups sharing bandwidth, or by adding more channels to increase the available bandwidth.  Alternatively, it could have simply corrected its advertising and sold

slower speeds. Instead, Spectrum-TWC chose to mislead subscribers by promoting expensive high-speed plans that provided only a fraction of the promised speed to most subscribers on those plans.

119.    Spectrum-TWC knew that by failing to add more ports to its interconnection points with its backbone and content providers, its network would suffer from interruptions and slowdowns during peak hours, and deprive its subscribers of reliable access to online content.

120.    Despite making access to online content a central theme of its "Enjoy better" marketing campaign, Spectrum-TWC, for much of the Relevant Period, failed to maintain sufficient ports at its interconnection points with backbone and content providers.

121.    The high congestion levels at interconnection points had a foreseeable and measurable negative impact on the reliability of a Spectrum-TWC subscriber's access to online content. The effects of high congestion levels at interconnection points are measured by two metrics of Internet reliability: packet loss and latency.

122.    Packet loss is when packets of data being communicated between networks fail to reach their destination. High levels of packet loss result in slower download and upload speeds, poor quality Internet phone services and pauses or interruptions when streaming media or playing games online.

123.    Latency is the time for a data packet to go from a device to the content provider and back. High latency, also called "lags," adversely affects the reliability of Internet service. A high-latency network connection could disrupt the performance of online gaming, videoconferencing, internet phone service, and streaming media services.

124.    At 70% port capacity utilization, ports may have episodes of congestion that result in slowdowns and interruptions for subscribers.  The episodes of congestion increase in frequency and severity as port utilization approaches 90%, and can cause certain applications like streaming video and online gaming to stop working entirely.  Spectrum-TWC's ports with certain of its backbone and content providers far exceeded the 70% threshold.

**E.    Speed Tests Confirmed That Spectrum-TWC's Network Did Not Reliably Deliver Promised Speeds**

125.    Spectrum-TWC's failure to deliver the promised speeds was confirmed by actual speed test data collected from thousands of subscribers.

126.    Spectrum-TWC deceived the FCC by manipulating the average Internet speed results in the FCC's speed tests.  The company inflated the average speed results by providing increased Internet speeds when service groups were less utilized to offset (and conceal) test results showing slower speeds when the service groups had heavier usage.  By gaming the FCC speed tests in this manner, Spectrum-TWC concealed the fact that it failed to consistently deliver the promised speeds to its subscribers under actual network conditions.

127.    In the summer of 2013, Spectrum-TWC assured the FCC that it would replace the deficient D2 modems for all its subscribers, but it wanted to start by replacing the D2 modems of subscribers who had volunteered to assist the FCC in testing Internet speeds (the "FCC Panelists").[1]  In September 2013, the FCC agreed to exclude the slower speed results associated with any D2 modems on the 20 Mbps or higher tiers from its forthcoming report and allowed Spectrum-TWC to replace the FCC Panelists' modems.  Although Spectrum-TWC replaced the FCC Panelists' modems and instructed customer service representatives to make

---

[1]    The FCC Panel consisted of a subset of Spectrum-TWC subscribers across different service groups nationwide that assisted the FCC in testing Internet speeds.

sure FCC Panelists received "VIP treatment" and the "best in class devices" when swapping their modems, Spectrum-TWC, contrary to its representation to the FCC, did not proactively replace deficient D2 modems for all subscribers.

128.    Spectrum-TWC skewed the average speed results in the FCC reports by giving panelists the ability, at times, to report higher-than-advertised speeds ("overprovisioning") to conceal the fact that most subscribers, particularly those on congested service groups, received far less than their promised speed.

129.    There are several different Internet speed measurement tools that test whether subscribers are getting the Internet speed they paid for. The speed test results discussed below come from three sources.

130.    **Speedtest.net**: This was one of the most popular tests for subscribers to measure their Internet speeds. This test reported on the quality of the last mile of service by measuring how quickly a subscriber can download data from a test server that was typically hosted on the ISP's network.

131.    **Sam Knows**: This test was administered by an FCC contractor, Sam Knows, and systematically tested the Internet speeds ISPs delivered to modems in homes of volunteers across the United States. Periodically, the FCC released a report analyzing the results of systematic tests across ISPs for a single month of a year.

132.    The FCC and ISPs recruited volunteers across the country to assist the FCC and provided them with a device, called a "whitebox," which they attached to their modem. This whitebox automatically ran speed tests when the modem was not otherwise in use, including during peak hours (which the FCC defined as weeknights from 7 to 11 p.m. local time). This methodology deliberately excluded any performance degradation that may have occurred

within the home as the result of a subscriber's device or accessing the Internet over a wireless connection. In 2016, approximately 800 subscribers spread throughout different service groups across the country comprised Spectrum-TWC's FCC panel (the "FCC Panel").

133.    Spectrum-TWC independently contracted with Sam Knows to install a parallel, internal panel of whiteboxes in Spectrum-TWC network centers and the homes of Spectrum-TWC employees across the country (the "Spectrum-TWC Panel") to conduct network diagnostics and anticipate any concerns raised by results from the FCC Panel. In 2016, Spectrum-TWC had about 1,200 such whiteboxes distributed across different service groups in its network nationwide.

134.    One key performance indicator the Sam Knows whiteboxes helped track was the FCC's "80/80" consistent speed result. This refers to the "speed that at least 80% of the subscribers experience at least 80% of the time over peak periods."

135.    The Sam Knows test for FCC Panelists confirmed that subscribers on the 100, 200 and 300 Mbps plans received speeds that were consistently well below the speeds that they paid for. FCC panelists on the 100 Mbps plan generally received 73% to 87% of the advertised speed, panelists on the 200 Mbps plan generally received 49% to 58% of the promised speed, and panelists on the 300 Mbps plan generally received 33% to 52% of the promised speed.

136.    The Spectrum-TWC Panel results further confirmed the FCC Panel's findings. Spectrum-TWC Panel results confirmed that over this six month period, subscribers on the 100 Mbps plan received less than 80% of the advertised speed; subscribers on the 200 Mbps plan received less than 60% of the advertised speed, and subscribers on the 300 Mbps plan generally received 38% to 74% of the promised speeds.

35

## COUNT I

### Breach Of Contract On Behalf Of A Class Of
### Spectrum Business Customers From The Class States

137.    Plaintiffs reallege and incorporate by reference every allegation set forth in the

preceding paragraphs as though alleged in this Count.

138.    Spectrum provides its Business subscribers with "Commercial Service Terms and

Conditions" which states in pertinent part relevant to the claims asserted in this action:

> 2.    Charter shall provide the Services during the Service Period
> to Customers identified in the Service Order(s).
>
> .    .    .    .
>
> 8.    Internet Access Service.  This internet Access Service
> Section shall only apply if Internet Access Services are
> included in a Service Order under this Agreement; however
> continued use of the Internet Service shall be subject to the
> provisions of this Agreement.
>
> > (a)    Internet Service Speeds.  Charter shall use
> > commercially reasonable efforts to achieve the
> > Internet speed selected by Customer on the Service
> > Order, however, actual internet speeds may vary.
>
> .    .    .    .
>
> 13.    Performance.  Charter will use commercially reasonable
> efforts in keeping with normal industry standards to ensure
> that the Service is available to Customer 24 hours per day,
> seven days per week.  It is possible, however, that there
> will be interruptions of Service.  The Service may be
> unavailable from time-to-time either for scheduled or
> unscheduled maintenance, technical difficulties, or for
> other reasons beyond Charter's reasonable control.
> Temporary service interruptions/outages for such reasons,
> as well as service interruptions/outages caused by
> Customer, its agents and employees, or by a Force Majeure
> Event, shall not constitute a failure by Charter to perform it
> obligations under this Agreement, and Customer will not

Charter a fault for loss of Customer revenue or lost
employee productivity due to Service outages.

15.    Limitations of Liability.

(a)    Limited Warranty.  At all times during the Service
Period, Charter warrants that it will use
commercially reasonable efforts in keeping with
industry standards to cause the Services to be
available to Customer.  Charter does not warrant
that Services will be error free.

139.    Defendants breached their contractual obligations to:  (i) use "commercially
reasonable efforts to achieve the internet speeds selected by the customer; (ii) use commercially
reasonable efforts in keeping with normal industry standards to ensure that "the Service" is
available to customers 24 hours per day, seven days per week; and (iii) use reasonably
commercial efforts in keeping with industry standards to cause "the Services" to be available to
the customer.

140.    Defendants failure to deliver the advertised speeds and services was commercially
unreasonable in light of (i) the premium prices paid by business customers and the high profit
margins earned by defendants were on their business customers; (ii) the ability of other
companies such as MidContinental, Cox and Medicom to deliver 1  gigabit or better broadband
speeds; (iii) the fact that the  relevant DOCSIS 3.0 technology had been introduced in 2006; (iv)
the fact that defendants had been increasing modem/router rental rates from $3.95 per month in
2013 to $6 per month in 2013 to $8 per month in 2015 and eventually to $11 per month and; (v)
Defendants strategy of limiting "port capacity" to extract higher fees from backbone and content
providers even though it resulted in over-congestion of the system which impaired the reliability
of its internet services for its business customers .

141.    As a result of the foregoing breaches, Plaintiffs and class members have been deprived of the benefits of the services they paid for and have sustained loss and damage as a result thereof.

## COUNT II

**By Plaintiff Justen Leslie On Behalf Of A Subclass of New York Spectrum Business Customers For Violations Of  General Business Law § 349: Deceptive Business Practices**

142.    Plaintiff Leslie repeats  and re-alleges  paragraphs 1 through  139 and incorporates them by reference  herein.

143.    GBL § 349 prohibits deceptive  acts and practices  in the conduct  of any business,  trade, or commerce  or in the furnishing  of any service  in the state of New York.

144.    Defendants  have engaged  in repeated and persistent  deceptive  acts and practices, including  but not limited to:

a.    Misrepresenting the speed  of the Internet service  consistently delivered to subscribers,  including  by:

i.    Leasing subscribers' older-generation, single-channel modems and deficient wireless routers that was incapable of delivering the promised speeds; and

ii.    Failing to allocate  sufficient resources  for Spectrum-TWC's network  to reliably  deliver  the speeds promised  to subscribers, including  by failing  to reduce the size of service  groups  or to add additional  channels  to each service  group.

b.    Misrepresenting the ability of subscribers to reliably  access online content, including  by failing  to maintain sufficient port capacity  to ensure that subscribers would  not experience  buffering, slowdowns, interruptions, lags, down times or other indicators of unreliable Internet  service.

145.    By these actions in violation of GBL § 349, Defendants have caused Plaintiffs

loss and damage and are therefore liable to Plaintiff Justen and New York subclass members.

### COUNT III

**By Plaintiff JB On Behalf Of A Subclass Of California Spectrum Business Customers For Violations Of California's Unfair Competition Law California Business And Professions Code § 17200 *et seq.***

146.    Plaintiff JB realleges and incorporates by reference every allegation set forth in

the preceding paragraphs as though alleged in this Count.

147.    Defendants' practices, misrepresentations, and omissions alleged herein constitute

unlawful, unfair, or fraudulent business practices in violation of California Business and

Professions Code § 17200 *et seq*.

148.    The misrepresentations and omissions by Defendants alleged herein were the type

of representations and omissions that are regularly considered to be material, *i.e.*, a reasonable

person would attach importance to them and would be induced to act on the information in

making purchase decisions.

149.    Plaintiff JB reasonably relied upon Defendants' material misrepresentations and

omissions in purchasing his bundled cable services from Defendants.

150.    As a result of the foregoing, Plaintiff JB and the California subclass have been

injured and have lost money or property and are entitled to money damages.

### COUNT IV

**By Plaintiff JB On Behalf Of A Subclass Of California Spectrum Business Customers For Violations Of California Business And Professions Code § 17500 *et seq.* ("FAL")**

151.    Plaintiff JB realleges and incorporates by reference every allegation set forth in

the preceding paragraphs as though alleged in this Count.

152.    Defendants have committed acts of untrue and misleading advertising, as defined by California Business and Professions Code § 17500 ("False Advertising Law" or "FAL"), by engaging in the acts and practices described herein with the intent to induce customers to purchase its service plans.

153.    Defendants' misrepresentations and omissions deceive or have a tendency to deceive the general public.

154.    The misrepresentations and omission by Defendants alleged herein were the type of representations and omissions that are regularly considered to be material, *i.e.*, a reasonable person would attach importance to them and would be induced to act on the information in making purchase decisions.

155.    Plaintiff JB reasonably relied on Defendants' false advertising in purchasing his internet services from Defendants.

156.    As a result of the foregoing, Plaintiff JB and the California subclass have been injured and have lost money or property and are entitled to damages.

## COUNT V

**Plaintiff Bregman On Behalf Of A Subclass Of California Spectrum
Business Customers For Violations Of California's Consumers
Legal Remedies Act ("CLRA") California Civil Code § 1750 *et seq***

157.    Plaintiff JB realleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

158.    Defendants are "persons," as defined by California Civil Code § 1761(c).

159.    Plaintiff is a "consumer" as defined by California Civil Code § 1761(d).

160.    The service plans marketed and sold by Charter constitute "goods" and "services" as defined by California Civil Code § 1761(a) and (b).

161.    Plaintiff's purchases of Defendants' services constitute "transactions," as defined by California Civil Code § 1761(e).

162.    Defendants' misled customers including Plaintiff to believe Defendants could and would provide interact service speeds and quality as described here, but in fact Defendants could not and did not provide the level of service promoted.

163.    Defendants deceived consumers including Plaintiff.

164.    Defendants' misrepresentations, active concealment, and failures to disclose violated the CLRA in ways including, but not limited to, the following:

a.    Defendants misrepresented that its service plans had characteristics, benefits, or uses that they did not have (California Civil Code § 1770(a)(5));

b.    Defendants advertised its services with an intent not to sell them as advertised (California Civil Code § 1770(a)(9));

c.    Defendants made false and misleading statements of fact concerning reasons for, existence of, or amounts of price levels (California Civil Code § 1770(a)(13));

d.    Defendants misrepresented that its service plans conferred rights, remedies or obligations that they did not have (California Civil Code § 1770(a)(14)); and

e.    Defendants misrepresented that its service plans were supplied in accordance with previous representations when they were not (California Civil Code § 1770(a)(16)).

165.    Defendants' misrepresentations and nondisclosures regarding its service plans were material to Plaintiff, and also to other California subclass members, because a reasonable person would have considered them important in deciding whether to purchase Defendants' service plans, and because Defendants had a duty to disclose the truth.

166.    Plaintiff JB relied upon Defendants' material misrepresentations and nondisclosures, and had he known the truth, he would have acted differently.

167.    As a direct and proximate result of Defendants' material misrepresentations and nondisclosures, Plaintiff JB and the California subclass have suffered monetary damages.

## COUNT VI

### By Plaintiff CT On Behalf Of A Subclass Of Texas Spectrum Business Customers For Violations Of Texas Deceptive Trade Practices Act (TDTPA)

168.    Plaintiff CT repeats and realleges each and every allegation set forth above as if fully set forth herein.

169.    The TDTPA, Tex. Bus. & Com. Code Ann. § 17.41, et. seq., prohibits the use of any "deceptive" or "unfair" or "unconscionable" act or practice in connection with a consumer transaction.

170.    A class action for damages is allowed to stop deceptive, unfair, or unconscionable practices under the TDTPA.

171.    Plaintiff CT pursues claims under both the deceptive and unfair and the unconscionable sections of the TDTPA.

172.    Plaintiff CT was injured by Defendants' deceptive, unfair, or unconscionable acts or practices.

173.    Defendants' actions were a producing cause of Plaintiff CT injuries.

174.    Defendants violated the TDTPA by engaging in unfair and deceptive trade practices by making representations knowingly or with reason to know that its internet service is materially different from the advertised speeds represented by Spectrum-TWC in violation of Tex. Bus. & Com. Code Ann. § 17.46(b)(7).

175. Defendants, in violation of Tex. Bus. & Com. Code Ann. § 17.46(b)(2), (5), (13), and (24) engaged in unfair and deceptive trade practices.

176. The pricing and misrepresentations of the internet services are also an "unconscionable action or course of action" under Tex. Bus. & Com. Code Ann. § 17.45(5).

177. As a result of Defendants' practices, Plaintiff Tramontozzi and the Texas subclass have suffered damages and are entitled to recover those damages (including treble damages and mental anguish damages) and costs, including reasonable attorneys' fees, from the Defendants under the DTPA.

## COUNT VII

### By Plaintiff KO On Behalf Of A Subclass Of Wisconsin Spectrum Business Customers For Violations Of Wisconsin Deceptive Trade Practices Act

178. Plaintiff KO repeats and realleges the above paragraphs.

179. Wisconsin's Deceptive and Trade Practices Act, Wisc. Stat. § 100.18(1), broadly prohibits deceptive acts or practices in the state of Wisconsin toward consumers.

180. As detailed above, Defendants engaged in deceptive acts toward consumers in violation of Wisconsin law.

181. Defendants' violation of Wisconsin law caused harm to consumers.

182. As a result of Defendants' deceptive conduct within Wisconsin, Wisconsin members of the Class have suffered actual damages and an ascertainable loss of money or property in an amount to be determined at trial.

183. It is proper to double the damages and award attorneys' fees.

## COUNT VIII

**By Plaintiffs On Behalf Of Respective Subclasses Of The Class States
For Violation Of Their Respective State Consumer Protection Laws**

### A.  ALABAMA DECEPTIVE TRADE PRACTICES ACT (ADTPA)

184.    The ADTPA, Ala. Code § 8-19-1 *et seq.*, prohibits the use of any

"unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or

commerce."

185.    As detailed above, Defendants engaged in misleading, false and deceptive acts in

violation of the ADTPA.

186.    Furthermore, Defendants' conduct is unconscionable in violation of the ADTPA.

187.    Defendants, in violation of at least Ala. Code Ann. § 8-19-5 (2), (5), (13), and

(27), engaged in unconscionable, false, misleading, and deceptive acts and practices in the

conduct of trade and commerce.

188.    As a result of Defendants' unconscionable, false, misleading, and deceptive acts

and practices in the conduct of trade and commerce, the Alabama members of the class have

suffered damages and an ascertainable loss of money or property in an amount to be determined

at trial.

### B.  ARIZONA CONSUMER FRAUD ACT (ACFA)

189.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully

set forth herein.

190.    The Arizona Consumer Fraud Act broadly prohibits fraudulent, deceptive, or

misleading conduct in connection with the sale or advertisement of consumer goods and services.

Ariz. Rev. Stat. § 44-1522(A).

191.    Members of the Arizona class relied upon Spectrum-TWC's material misrepresentations and omissions regarding the internet service, as set forth above.

192.    These material misrepresentations by Spectrum-TWC proximately caused the Arizona class to overpay for internet service and equipment.

193.    Because Spectrum-TWC acted willfully and reprehensibly, the Arizona class is entitled to compensatory and punitive damages under the ACFA.

## C.  COLORADO CONSUMER PROTECTION ACT (CCPA)

194.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

195.    The Colorado Consumer Protection Act, C.R.S. 6-1-101, et seq., prohibits unfair or deceptive practices.

196.    Colorado members of the Class leased or purchased internet services and goods, as alleged herein.

197.    Defendants knowingly engaged in false, misleading, or deceptive acts or practices through the unlawful conduct alleged herein, in violation of C.R.S. 6-1-105(1)(b), (1)(e), (1)(g), (1)(l), (1)(u), (2), and (3).

198.    By doing so, Defendants caused Colorado members of the Class and the public to suffer actual damages.

199.    As a result, Colorado members of the Class are entitled to recover the damages they suffered.

## D.  HAWAII UNFAIR PRACTICES AND UNFAIR COMPETITION ACT (HUPUCA)

200.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

201.    The HUPUCA, H.R.S. § 480-1 *et seq.*, prohibits the use of any "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

202.    As detailed above, Defendants engaged in deceptive acts in violation of the HUPUCA.

203.    Furthermore, Defendants' conduct is unfair in violation of the HUPUCA.

204.    In addition, Defendants' conduct is an unfair method of competition in violation of the HUPUCA.

205.    As a result of Defendants' unfair methods of competition and unfair and deceptive acts and practices in the conduct of trade and commerce, Hawaii members of the Class have suffered damages and an ascertainable loss of money or property in an amount to be determined at trial.

### E.  IDAHO CONSUMER PROTECTION ACT (ICPA)

206.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

207.    The ICPA, I.C. § 48-601 *et seq.*, prohibits the use of any "unfair or deceptive acts or practices in the conduct of any trade or commerce[.]"

208.    As detailed above, Defendants engaged in deceptive acts in violation of the ICPA.

209.    Furthermore, Defendants' conduct is unfair in violation of the ICPA.

210.    Defendants, in violation of at least I.C. § 48-603 (2), (11), (16), (17), and (18), and § 48-603C, engaged in unfair and deceptive acts and practices in the conduct of trade and commerce.

211.    As a result of Defendants' unfair and deceptive acts and practices in the conduct of trade and commerce, Idaho members of the Class have suffered damages and an ascertainable loss of money or property in an amount to be determined at trial.

## F.  INDIANA DECEPTIVE CONSUMER SALES ACT (IDCSA)

212.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

213.    The IDCSA, Ind. Code § 24-5-0.5-0.1 *et seq.*, prohibits the use of any "unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction."

214.    As detailed above, Defendants engaged in deceptive acts in violation of the IDCSA.

215.    Furthermore, Defendants' conduct is unfair and abusive in violation of the IDCSA.

216.    Defendants, in violation of at least Ind. Code § 24-5-0.5-3(b) (5), (6), and (7), engaged in unfair, abusive, and deceptive acts, omissions, and practices in connection with a consumer transaction.

217.    As a result of Defendants' unfair, abusive, and deceptive acts, omissions, and practices in connection with a consumer transaction, Indiana members of the Class have suffered damages and an ascertainable loss of money or property in an amount to be determined at trial.

## G.  KANSAS CONSUMER PROTECTION ACT (KCPA)

218.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

219.    The KCPA, K.S.A. 59-623, et seq., prohibits the use of any "deceptive" or "unconscionable" act or practice in connection with a consumer transaction by a supplier and provides that an aggrieved consumer may seek private remedies for, among other things, damages.

220.    A class action for damages is allowed to stop deceptive or unconscionable practices under the KCPA.

221.    Plaintiffs pursue claims under both the deceptive and unconscionable setions of the KCPA.

222.    Defendants are suppliers under the KCPA.

223.    It is immaterial "whether or not any customer has in fact been misled" under the KCPA, as set forth in K.S.A. 50-626(b), so reliance in not an element.

224.    Defendants violated the KCPA by engaging in unfair and deceptive trade practices by making representations knowingly or with reason to know that the internet services and modems and routers were materially different from the representations made by Defendants, in violation of K.S.A. 50-62(b)(1)(D) and (2).

225.    Defendants, in violation of K.S.A. 60-626(b)(1)(F), (G) and (2) and (9), engaged in unfair and deceptive trade practices.

226.    The KCPA also prohibits unconscionable acts and practices, as set forth in K.S.A. 50-627.

227.    Unconscionable acts and practices are defined broadly under the KCPA and are based on a non-exclusive list of factors.

228.    Defendants have engaged in an unconscionable practice by charging for services and equipment which were materially inferior to their description in violation of 50-627(b).

229.    As a result of Defendants' practices, Plaintiffs and the class members have suffered damages and are entitled to recover those damages and costs, including reasonable attorneys' fees, from the Defendants under the KCPA.

## H.  KENTUCKY CONSUMER PROTECTION ACT (KCPA)

230.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

231.    The Kentucky Consumer Protection Act prohibits "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Ky. Rev. Stat. Ann. 367.170.

232.    Kentucky members of the Class purchased "goods or services" as alleged herein.

233.    Defendants engaged in unfair, false, misleading, or deceptive acts or practices through the unlawful conduct alleged herein.

234.    As a result of Defendants' unfair, false, misleading, or deceptive acts or practices alleged herein, the Kentucky members of the Class have suffered damages and an ascertainable loss of money or property in an amount to be determined at trial.

235.    Kentucky members of the Class are entitled to recover statutory penalties, actual, consequential, and punitive damages, equitable and declaratory relief, costs and reasonable attorneys' fees.

## I.   MAINE UNFAIR TRADE PRACTICES ACT (MUTPA) AND UNIFORM DECEPTIVE TRADE PRACTICES ACT (MUDTPA)

236.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

237.    The MUTPA, 5 M.R.S.A. § 205-A *et seq.*, prohibits the use of any "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]"

238.    In addition, the MUDTPA, 5 M.R.S.A. § 1211 *et seq.*, prohibits the use of various deceptive trade practices.

239.    As detailed above, Defendants engaged in deceptive acts in violation of the MUTPA and the MUDTPA.

240.    Furthermore, Defendants' conduct is unfair in violation of the MUTPA.\

241.    In addition, Defendants' conduct is an unfair method of competition in violation of the MUTPA.

242.    Defendants, in violation of at least 5 M.R.S.A. § 207 and § 1212 (K) and (L), engaged unfair methods of competition and unfair and deceptive acts and practices in the conduct of trade and commerce.

243.    As a result of Defendants' unfair methods of competition and unfair and deceptive acts and practices in the conduct of trade and commerce, Plaintiff and the other Maine members of the Class have suffered damages and an ascertainable loss of money or property in an amount to be determined at trial.

## J.  MASSACHUSETTS CONSUMER PROTECTION ACT

244.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

245.    Massachusetts's Consumer Protection Act, Mass. Gen. Laws ch. 93A, makes it unlawful to engage in any unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

246.    Unfair acts or practices include practices that are within at least the penumbra of some common-law, statutory, or other established concept of unfairness; immoral, unethical, oppressive, or unscrupulous acts; or acts that cause substantial injury. Deceptive acts or practices include those that would reasonably cause a person to act differently from the way he or she otherwise would have acted.

247.    As alleged throughout this Complaint, Spectrum-TWC engaged in unfair, deceptive, and/or unlawful practices in violation of Mass. Gen. Law's Ch. 93A.

248.    Spectrum-TWC's conduct offends public policy and is immoral, unethical, oppressive, unscrupulous, or substantial injurious to consumers.

249.    Additionally, Spectrum-TWC's conduct was deceptive because it caused the Massachusetts members of the Class to act differently from the way they would have otherwise acted.

250.    Spectrum-TWC's unfair and/or deceptive acts or practices in violation of Mass. Gen. Laws Ch. 93A, § 2, proximately caused the Massachusetts members of the Class adverse consequences or losses, including the loss of money from purchasing Spectrum-TWC's services at an inflated price. The losses and adverse consequences the Massachusetts members of the Class suffered by purchasing Spectrum-TWC's internet services were foreseeable results of Spectrum-TWC's unfair, deceptive, and/or unlawful advertising and marketing.

251.    As a result of Spectrum-TWC's violations of Massachusetts's Consumer Protection Act, the Massachusetts members of the Class seek an order of this Court awarding actual damages, punitive damages, restitution, an injunction against the use of unlawful trade practices, attorneys' fees and costs, and for such other relief as set forth below.

### K.  MISSOURI MERCHANDISING PROTECTION ACT (MMPA)

252.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

253.    Missouri's Merchandising Practices Act (the "MMPA") prohibits the act, use, or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce Mo. Rev Stat. § 407.020.

254.    An "unfair practice" under Missouri law includes several types; Spectrum-TWC has engaged in an "unfair practice" with the pricing of its internet service for several independent reasons as set forth herein.

51

255.    According to Missouri law, an "(1) An unfair practice is any practice which— (A) Either— 1. Offends any public policy as it has been established by the Constitution, statutes or common law of this state, or by the Federal Trade Commission, or its interpretive decisions; or 2. Is unethical, oppressive or unscrupulous; and (B) Presents a risk of, or causes, substantial injury to consumers." 15 CSR 60-8.020.

256.    Spectrum-TWC's conduct constitutes an unfair practice in that Spectrum-TWC sells the internet service for a price that is unethical, oppressive, and unscrupulous.

257.    According to Missouri law, an unconscionable practice is an "unfair practice." 15 CSR 60-8.080.

258.    According to Missouri law, it is "unfair practice" to sell a product and to engage in any practice that violates state or federal law intended to protect the public. 15 CSR 60- 8.090.

259.    Defendant's unlawful practices have caused similar injury to numerous other persons under Missouri law, § 407.025.2.

## L.  NEBRASKA CONSUMER PROTECTION ACT (NCPA)

260.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

261.    The Nebraska Consumer Protection Act, 59-1601, et seq., prohibits unfair or deceptive acts and practices.

262.    Nebraska members of the Class purchased internet services as alleged herein.

263.    Defendants knowingly committed unfair and deceptive acts and practices, as set forth above, in violation of Neb. Rev. Stat. 59-1602.

264.    By doing so, Defendants caused Nebraska consumers to suffer actual damages and caused harm to the public.

265.    As a result, Nebraska members of the Class are able to recover the damages they suffered.

266.    Because Defendants Spectrum-TWC's violation was willful, trebled damages are appropriate.

267.    Plaintiffs are also entitled to reasonable attorneys' fees and costs.

### M. NEW HAMPSHIRE CONSUMER PROTECTION ACT (NHCPA)

268.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

269.    The NHCPA, N.H. Rev. Stat. § 358-A:1 *et seq.*, prohibits "any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state."

270.    As detailed above, Defendants engaged in deceptive acts in violation of the NHCPA.

271.    Furthermore, Defendants' conduct is unfair in violation of the NHCPA.

272.    In addition, Defendants' conduct is an unfair method of competition in violation of the NHCPA.

273.    Defendants, in violation of at least N.H. Rev. Stat. § 358-A:2, including subsections (XI) and (XIV), engaged in unfair methods of competition and unfair and deceptive acts and practices in the conduct of trade and commerce within New Hampshire.

274.    As a result of Defendants' unfair methods of competition and unfair and deceptive acts and practices in the conduct of trade and commerce within New Hampshire, New Hampshire members of the Class have suffered damages and an ascertainable loss of money or property in an amount to be determined at trial.

### N.  NEW JERSEY CONSUMER FRAUD ACT (NJCFA)

275.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

276.    The NJCFA, N.J. Stat. Ann. § 56:8-1 *et seq.*, prohibits "unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission[.]"

277.    As detailed above, Defendants engaged in deceptive, false and fraudulent acts in violation of the NJCFA.

278.    Furthermore, Defendants' conduct is unconscionable in violation of the NJCFA.

279.    As a result of Defendants' deceptive, false, fraudulent and unconscionable practices, New Jersey members of the Class have suffered damages and an ascertainable loss of money or property in an amount to be determined at trial.

## O.  NEW MEXICO UNFAIR PRACTICES ACT

280.    Plaintiffs repeat and realleged the above paragraphs.

281.    New Mexico's Unfair Practices Act, N.M. Stat. § 57-12-1, et seq., broadly prohibits deceptive acts or practices and also unconscionable acts in the state of New Mexico toward consumers.

282.    As detailed above, Defendants engaged in deceptive acts toward consumers in violation of New Mexico law.

283.    As detailed above, Defendants engaged in unconscionable acts toward consumers in violation of New Mexico law.

284.    Defendants' violation of New Mexico law caused harm.

285.    As a result of Defendants' deceptive and unconscionable conduct within New Mexico, New Mexico members of the Class have suffered actual damages and an ascertainable loss of money or property in an amount to be determined at trial.

286.    It is proper to treble the damages and award attorneys' fees.

## P.  NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT (NCUDTPA)

287.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

288.    The North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. 75-1.1, prohibits unfair or deceptive acts or practices.

289.    Plaintiffs and the other North Carolina members of the Class purchased the EpiPen primarily for personal, family or household purposes, as alleged herein.

290.    Defendants knowingly committed unfair and deceptive acts and practices, as set forth above, in violation of N.C. Gen. Stat. 75-1.1.

291.    By doing so, Defendants caused North Carolina members of the Class to suffer actual damages.

292.    As a result, North Carolina members of the Class are able to recover the damages they suffered.

293.    Because Spectrum-TWC's violation was willful, trebled damages are appropriate.

294.    Plaintiffs are also entitled to reasonable attorneys' fees and costs.

## Q.  OHIO CONSUMER SALES AND PRACTICES ACT (DCFA)

295.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

296.    The Ohio Consumer Sales and Practices Act, Ohio R.C. 1345.02, et seq., prohibits unfair or deceptive acts and practices.

297.    Plaintiffs and the other Ohio members of the Class purchased services and products as alleged herein.

298.    Defendants are suppliers.

299.    Defendants knowingly committed unfair and deceptive acts and practices, as set forth above, in violation of Ohio R.C. 1345.02.

300.    By doing so, Defendants cause Ohio members of the Class to suffer actual damages and caused harm to the public.

301.    As a result of these violations, Ohio members of the Class are able to recover the damages they suffered.

302.    Because Defendants' violation was willful, trebled damages are appropriate.

303.    Plaintiffs are also entitled to reasonable attorney's fees and costs.

### R.  PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (PUTPCPL)

304.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

305.    The PUTPCPL prohibits unfair or deceptive acts or practices.  73 Pa. Stat. Ann. § 201-3.

306.    Among other things, the PUTPCPL prohibits "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding."  73 Pa. Stat. Ann. § 201-2(4)(xxi).

307.    As set forth above, Defendants engaged in unfair and deceptive acts and practices in connection with their internet services and equipment.

308.     Further, Defendants offered internet services and equipment in Pennsylvania and their conduct was a direct and substantial impact on trade and commerce in Pennsylvania. Accordingly, such conduct falls within the prohibitions of the PUTPCPL.

309.     Pennsylvania members of the Class are entitled to recover damages.

## S.  VIRGINIA CONSUMER PROTECTION ACT (VCPA)

310.     Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

311.     The Virginia Consumer Protection Act, Va. Code 59.1-196, et seq., prohibits deceptive practices committed by a supplier against consumers.

312.     Virginia members of the Class purchased internet services, as alleged herein, from Defendants, who acted as suppliers under Virginia law.

313.     Virginia members of the Class all relied on the deceptive practices committed by Spectrum-TWC.

314.     Defendants knowingly engaged in false, misleading, or deceptive acts or practices through the unlawful conduct alleged herein, in violation of Va. Code 59.1-200(A)(2), (5), (6), (9), and (14).

315.     By doing so, Defendants caused Virginia consumers to suffer actual damages.

316.     As a result, Virginia consumers are able to recover the damages they suffered.

317.     Because Spectrum-TWC's violation was willful, treble damages are appropriate. Virginian members of the Class are also entitled to reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request the following relief:

A.     Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a) and b(1), b(2) and/or b(3); direct that reasonable notice of this action, as provided

by Fed. R. Civ. P. 23(c)(2) be given to the Class; and declare that Plaintiffs are the representatives of the End-Payor Class;

      B.      Require Spectrum-TWC to pay for sending notice to the certified class of all business customers;

      C.      Appoint Plaintiffs as Class Representatives and Plaintiff's counsel as Class Counsel;

      D.      Award compensatory damages to Plaintiffs and the proposed Class in an amount to be established at trial, or, alternatively, require Defendants to disgorge or pay restitution in an amount which, when aggregated with all other elements of damages, costs, and fees;

      E.      Award treble damages as permitted by law;

      F.      Award pre- and post-judgment interest;

      G.      Award punitive damages based on Defendants' reprehensible and deliberate conduct;

      H.      Award reasonable attorneys' fees and costs; and

      I.      For all such other and further relief as may be just and proper.

Dated:  April 18, 2018

                    SQUITIERI & FEARON LLP

                    By:  /s/ Lee Squitieri
                        Lee Squitieri
                    32 East 57th Street
                    12th Floor
                    New York, New York 10022
                    Tel: 212-421-6492
                    Fax:  212-421-6553
                    lee@sfclasslaw.com

LAW OFFICE OF JOSEPH SANTOLI

By: /s/ Joseph Santoli
    Joseph Santoli
340 Devon Court
Ridgewood, New Jersey 07450
Telephone:  (201) 926-9200
Facsimile:  (201) 444-0981
Email: josephsantoli@aol.com


[Proposed] Co-Lead Counsel for Plaintiffs