UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

KEN OLSEN, JEFF BREGMAN, CHUCK              18cv3388 (JGK)
TRAMONTOZZI and JUSTEN LESLIE,

            Plaintiffs,

      - against -

CHARTER COMMUNICATIONS, INC.,
CHARTER COMMUNICATIONS HOLDINGS, LLC
and SPECTRUM MANAGEMENT HOLDING
COMPANY, LLC (f/k/a TIME WARNER
CABLE, INC.),

            Defendants.

---

WOLFSON & CARROLL, LLC, LUKE VICENS         18cv4972 (JGK)
and DAVID GOMEZ,

            Plaintiffs,

      - against -                           **MEMORANDUM OPINION
                                            AND ORDER**

CHARTER COMMUNICATIONS, INC.,
CHARTER COMMUNICATIONS HOLDINGS, LLC
and SPECTRUM MANAGEMENT HOLDING
COMPANY, LLC (f/k/a TIME WARNER
CABLE, INC.),

            Defendants.

---

**JOHN G. KOELTL, District Judge:**

     The defendants in these two cases -- Charter

Communications, Inc., Charter Communications Holdings, LLC, and

Spectrum Management Holding Company, LLC (collectively,

"Charter") -- have moved to compel the plaintiffs to arbitrate

their claims for breach of contract and unfair business

practices. The two class actions are substantively identical. At

1

issue is whether the parties entered into validly formed and enforceable arbitration agreements. For the reasons explained below, the defendants' motion to compel arbitration and to stay these cases is **granted**.

I.

The following facts are undisputed unless otherwise indicated.

A.

The plaintiffs were customers of Charter or one of its former subsidiaries, Time Warner Cable ("TWC").[1] Between 2009 and 2016, all of the plaintiffs, with the exception of Mr. Vicens who will be discussed below, "signed up and paid for" TWC's "business class" internet services. (Flores Decl. ¶¶ 10-15.) Other than plaintiff Wolfson & Carroll, LLC, each of the plaintiffs subscribed in an individual capacity, but appear to have used TWC's services for their businesses. (Id. Exs. A, C, E, G, J, K.) For example, plaintiff Chuck Tramontozzi subscribed as the owner of "Benz and Bikes." (Id. ¶ 11; Ex. C.)

As subscribers, the plaintiffs all received similar one-page Service Agreements that were subject to a separate set of

---

[1]    Plaintiff Bregman alleges that he became a TWC business class customer in or about 2010, but Charter has been unable to find any record of his customer account. (Olson Am. Compl. ¶ 17; Defs.' Mem. at 2 n.3.) The parties do not dispute that to become a TWC business class customer, Bregman must have signed a similar Service Agreement in order to receive TWC's services like all of the other plaintiffs. (Flores Decl. ¶ 9.)

"Terms and Conditions." (Id. ¶¶ 10-15; Exs. A, C, E, G, J, K.)
Each Service Agreement notified the customer of the Terms and
Conditions and of a specific provision for arbitration of
disputes relating to the agreement. For example, plaintiff
Tramontozzi received the following notice:

> THIS TIME WARNER CABLE BUSINESS CLASS SERVICES
> AGREEMENT   IS   SUBJECT   TO . . . TERMS   AND
> CONDITIONS AVAILABLE AT WWW.TWCBC.COM/LEGAL,
> A COPY OF WHICH WILL BE PROVIDED TO CUSTOMER
> UPON REQUEST. . . . BY EXECUTING THIS . . .
> AGREEMENT . . . CUSTOMER   ACKNOWLEDGES   THAT
> (1) CUSTOMER ACCEPTS AND AGREES TO BE BOUND BY
> ALL   SUCH   TERMS   AND   CONDITIONS,   INCLUDING
> SECTION 21 THEREOF, WHICH PROVIDES THAT THE
> PARTIES DESIRE TO RESOLVE DISPUTES RELATING TO
> THE . . . AGREEMENT THROUGH ARBITRARTION; AND
> (2) BY AGREEING TO ARBITRATION, CUSTOMER IS
> GIVING UP VARIOUS RIGHTS, INCLUDING THE RIGHT
> TO TRIAL BY JURY.

(Id. Ex. C.) Each plaintiff signed a Service Agreement. (Id.
Exs. A, C, E, G, J, K.)

As the Service Agreements stated, customers could view the
separate "Terms and Conditions" document on TWC's website. (Id.
¶ 16; Exs. B, D, F, H, I.) These Terms and Conditions (the
"Legacy Terms") remained largely unchanged until 2017. The
Legacy Terms' full arbitration provision, Section 21, read:

> EXCEPT FOR CLAIMS FOR INJUNCTIVE RELIEF, AS
> DESCRIBED BELOW, ANY PAST, PRESENT, OR FUTURE
> CONTROVERSY OR CLAIM ARISING OUT OF OR RELATED
> TO THIS AGREEMENT SHALL BE RESOLVED BY BINDING
> ARBITRATION   ADMINISTERED   BY   THE   AMERICAN
> ARBITRATION ASSOCIATION UNDER ITS COMMERCIAL
> ARBITRATION RULES, INCLUDING, IF APPLICABLE,
> THE   SUPPLEMENTARY   PROCEDURES   FOR   THE

RESOLUTION OF CONSUMER RELATED DISPUTES. CONSOLIDATED OR CLASS ACTION ARBITRATIONS SHALL NOT BE PERMITTED. THE ARBITRATOR OF ANY DISPUTE OR CLAIM BROUGHT UNDER OR IN CONNECTION WITH THIS AGREEMENT SHALL NOT HAVE THE POWER TO AWARD INJUNCTIVE RELIEF; INJUNCTIVE RELIEF MAY BE SOUGHT SOLELY IN AN APPROPRIATE COURT OF LAW. NO CLAIM SUBJECT TO ARBITRATION UNDER THIS AGREEMENT MAY BE COMBINED WITH A CLAIM SUBJECT TO RESOLUTION BEFORE A COURT OF LAW. THE ARBITRABILITY OF DISPUTES SHALL BE DETERMINED BY THE ARBITRATOR. JUDGMENT UPON AN AWARD MAY BE ENTERED IN ANY COURT HAVING COMPETENT JURISDICTION. IF ANY PORTION OF THIS SECTION IS HELD TO BE UNENFORCEABLE, THE REMAINDER SHALL CONTINUE TO BE ENFORCEABLE.

(Id. Ex. D.; cf. id. Exs. B, F, H, I.) Every version of the Legacy Terms provided that some of its sections, including the arbitration provision of Section 21, "shall survive the termination or expiration of [the Legacy] Agreement." (Id. Ex. D.; cf. id. Exs. B, F, H, I.)

**B.**

In May 2016, TWC merged into Charter Communications, Inc., and was renamed Spectrum Management Holding Company, LLC. (Flores Decl. ¶ 4.) In 2017, as part of its post-merger organization, Charter replaced TWC's Legacy Terms with new terms and conditions (the "Updated Terms") for all new and existing business class customers. (Id. ¶ 17.) Charter notified existing customers about the Updated Terms through the customers' monthly billing statements, sent by U.S. mail, in June or July 2017. (Id. ¶¶ 18-22; Exs. M-R.) The plaintiffs do not dispute that

4

they received these billing statements. The notification that appeared on the front page of each billing statement in approximately twelve point font read:

> Service Terms and Conditions Updated. Our standard terms and conditions for Spectrum Business Services will be updated effective August 15, 2017. To obtain a copy, visit business.spectrum.com/newterms or call 1-866-892-4249 to request a paper copy to be mailed to your business.

(Id. Exs. M-R.) Like the Legacy Terms, the Updated Terms were available on Charter's website. (Id. ¶ 20.) The Updated Terms provided that a "[c]ustomer's continued use of the Services after notice of the change shall be considered [c]ustomer's acknowledgement and acceptance of the changes." (Id. Ex. L.) All of the plaintiffs who received a June or July 2017 billing statement paid their bills, and continued to use Charter's internet services afterwards. (Id. ¶¶ 18-19.)

Meanwhile, on July 26, 2017, plaintiff Vicens signed up for the same internet services that Charter now provided to all of the other plaintiffs. (Id. ¶ 21.) As a new customer, Vicens did not receive notice of the Updated Terms through a monthly billing statement. (Id.) Instead, the defendants allege -- and the plaintiffs do not dispute -- that Vicens received a business customer "Welcome Kit" brochure, which directed Vicens to review the Updated Terms on Spectrum's website. (Id.) Vicens also began receiving monthly billing statements that continuously reminded

customers to view the Updated Terms on Spectrum's website. (Id.
¶ 21; Exs. S, T.)

Like the Legacy Terms, the Updated Terms contained a
provision for arbitrating disputes. A warning located near the
beginning of the Updated Terms highlighted the existence of the
arbitration provision within the document:

> BY AGREEING TO THIS SERVICES AGREEMENT,
> CUSTOMER ACKNOWLEDGES THAT: (1) THE SERVICES
> AGREEMENT CONTAINS A BINDING ARBITRATION
> PROVISION, WHICH PROVIDES THAT THE PARTIES
> DESIRE TO RESOLVE ANY CONTROVERSY OR CLAIM
> ARISING OUT OF OR RELATING TO THE SERVICES
> AGREEMENT THROUGH ARBITRATION; AND (2) BY
> AGREEING TO ARBITRATION, CUSTOMER IS GIVING UP
> VARIOUS RIGHTS, INCLUDING THE RIGHT TO TRIAL
> BY JURY AND TO BRING CLAIMS AS CLASS ACTIONS.

(Id. Ex. L.) Section 18 of the Updated Terms contained the
arbitration provision itself:

> ARBITRATION. This Services Agreement requires
> the use of arbitration to resolve disputes and
> otherwise limits the remedies available to
> Customer in the event of a dispute. Subject to
> the "Exclusions" paragraph below,[2] Spectrum
> Business and Customer agree to arbitrate
> disputes and claims arising out of or relating
> to this Services Agreement, the Services, the
> Spectrum Business Equipment, Network, or
> marketing of the Services. Notwithstanding the
> foregoing, either party may bring an
> individual action on any matter or subject in
> small claims court. The arbitrator of any
> dispute or claim brought under or in
> connection with this Services Agreement shall

---

[2]     The plaintiffs' claims do not fall within the "Exclusions" carve-out
mentioned in this arbitration provision. That carve-out, which is Section
21(e) of the Updated Terms, forbids arbitration for small claims,
intellectual property disputes, and disputes concerning unauthorized use or
receipt of services. (Flores Decl. Ex. L.)

not have the power to award injunctive relief, which may only be sought in an appropriate court of law. No claim subject to arbitration under this Services Agreement may be combined with a claim subject to resolution before a court of law. THIS SERVICES AGREEMENT MEMORIALIZES A TRANSACTION IN INTERSTATE COMMERCE. THE FEDERAL ARBITRATION ACT GOVERNS THE INTERPRETATION AND ENFORCEMENT OF THESE ARBITRATION PROVISIONS.

(Id.) Section 18(a) of the Updated Terms elaborated that in an arbitration proceeding, "all issues are for the arbitrator to decide (including the scope of the arbitration clause)," and that arbitration should be administered by the American Arbitration Association ("AAA") and governed by the AAA's Commercial Arbitration Rules and the Supplementary Procedures for Consumer Related Disputes. (Id.)

Two other provisions that related to the arbitration provision concerned class claims and governing law. Section 18(c) waived each party's right to trial by judge or jury and barred class action claims, including during arbitration. It read in part:

CUSTOMER AGREES THAT, BY ENTERING INTO THIS AGREEMENT, CUSTOMER AND SPECTRUM BUSINESS ARE WAIVING THE RIGHT TO A TRIAL BY JUDGE OR JURY. CUSTOMER AND SPECTRUM BUSINESS AGREE THAT CLAIMS MAY ONLY BE BROUGHT IN CUSTOMER'S INDIVIDUAL CAPACITY AND NOT ON BEHALF OF, OR AS PART OF, A CLASS ACTION OR REPRESENTATIVE PROCEEDING. Furthermore, unless both Customer and Spectrum Business agree otherwise in writing, the arbitrator may not consolidate proceedings or more than one person's claims

7

and may not otherwise preside over any form of
representative or class proceeding.

(Id.) Section 22(g) designated New York law as governing the
Updated Terms, and designated venue for "any legal action" in
the United States District Court for the Southern District of
New York. (Id.)

### C.

In their amended complaints, the plaintiffs allege that
Charter (and before Charter, TWC) misled customers by
overcharging them for internet services that failed to deliver
the speedy services promised. (Olsen Am. Compl. ¶ 1; Wolfson Am.
Compl. ¶ 1.) The plaintiffs assert claims for breach of contract
and violation of state deceptive trade practices and consumer
protection laws. (Olsen Am. Compl. ¶¶ 140-318; Wolfson Am.
Compl. ¶¶ 139-317.) They also seek declaratory and injunctive
relief finding that any arbitration agreement is unenforceable,
and enjoining the defendants from enforcing any arbitration
agreement. (Olsen Am. Compl. ¶¶ 135-39; Wolfson Am. Compl.
¶¶ 134-38.) Finally, the plaintiffs seek restitution,
disgorgement, cancellation of amounts due on accounts,
accreditation of past amounts paid on accounts, and a

prohibition against cancelling services for reason of nonpayment. (Olsen Am. Compl. at 57; Wolfson Am. Compl. at 57.)

The defendants notified the plaintiffs in both matters of their intent to arbitrate. (Flores Decl. ¶¶ 23-24.) The plaintiffs have refused to arbitrate. (Defs.' Mem. at 6.)

## II.

### A.

Under 9 U.S.C. § 4, "a district court must enter an order to arbitrate upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 22 n.27 (1983) (quotation marks omitted). Pursuant to the Federal Arbitration Act,

> [A] court asked to stay proceedings pending arbitration in a case covered by the Act has essentially four tasks: first, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then determine whether to stay the balance of the proceedings pending arbitration.

Genesco, Inc. v. T. Kakiuchi & Co., Ltd., 815 F.2d 840, 844 (2d Cir. 1987) (citations omitted). Only the first and second tasks are at issue here.

Arbitration is a matter of contract and a party cannot be required to arbitrate if there is no binding arbitration agreement. A court rather than an arbitrator should decide whether a valid agreement to arbitrate existed. See Republic of Ecuador v. Chevron Corp., 638 F.3d 384, 392 (2d Cir. 2011).

"The determination of whether parties have contractually bound themselves to arbitrate a dispute — a determination involving interpretation of state law — is a legal conclusion." Specht v. Netscape Commc'ns Corp., 306 F.3d 17, 26 (2d Cir. 2002) (Sotomayor, J.). More specifically, "[a]rbitration clauses are a matter of contract law and, if valid, should be enforced." DuBois v. Macy's East Inc., 338 F. App'x 32, 33 (2d Cir. 2009).

The parties agree that New York law governs both the Legacy and Updated Terms. (Defs.' Mem. at 7; Pls.' Mem. at 10.) "To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound." Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 427 (2d Cir. 2004) (quotation marks omitted). Although the arbitration agreement must be in writing, "[t]here is no requirement that the writing be signed so long as there is other proof that the parties actually agreed on it." God's Battalion of Prayer Pentecostal Church, Inc. v. Miele Assocs., LLP, 845 N.E.2d 1265, 1265 (N.Y. 2006) (quotation marks omitted); see also Rightnour v. Tiffany & Co., 239 F. Supp. 3d 744, 750 (S.D.N.Y. 2017).

10

Ultimately, the agreement to arbitrate must be proved by a preponderance of the evidence. <u>Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela</u>, 991 F.2d 42, 46 (2d Cir. 1993).

In determining the existence of an agreement to arbitrate, "the [C]ourt applies a standard similar to that applicable for a motion for summary judgment. If there is any issue of fact as to the making of the agreement for arbitration, then a trial is necessary." <u>Bensadoun v. Jobe-Riat</u>, 316 F.3d 171, 175 (2d Cir. 2003) (citing 9 U.S.C. § 4). Charter bears the initial burden of showing the existence of an agreement to arbitrate. <u>See</u> <u>Crawley v. Macy's Retail Holdings, Inc.</u>, No. 15cv2228, 2017 WL 2297018, at *4 (S.D.N.Y. May 25, 2017). If Charter meets this burden, the plaintiffs, as the parties "to an arbitration agreement seeking to avoid arbitration[,] . . . [would] bear[ ] the burden of showing the agreement to be inapplicable or invalid." <u>Harrington v. Atl. Sounding Co.</u>, 602 F.3d 113, 124 (2d Cir. 2010).

**B.**

The parties agreed to arbitrate under the Updated Terms. Within a contract, "an agreement to arbitrate exists where the notice of the arbitration provision was reasonably conspicuous and manifestation of assent unambiguous as a matter of law." <u>Meyer v. Uber Techs., Inc.</u>, 868 F.3d 66, 76 (2d Cir. 2017). Both

conspicuous notice and clear manifestation of assent are satisfied here.[3]

The plaintiffs were on inquiry notice of the Updated Terms. The plaintiffs do not dispute that they received their regular billing statements, sent by Charter via U.S. mail, in June or July 2017. A billing statement, which "contains information at the heart of the service relationship" such as payments and other updates, is a method that could be "well-suited" for notifying customers about updates to Charter's terms and conditions. Hart v. Charter Commc'ns, Inc., No. 17cv556, 2017 WL 6942425, at *5 (C.D. Cal. Nov. 8, 2017).

The notice on the billing statements alerting customers about the change from the Legacy to the Updated Terms was sufficiently conspicuous. The notice was located in the middle of the front page of the billing statement, along with two other customer alerts. It was partially bolded and sized in approximately twelve-point font. The billing statement is similar to the adequate notice provided in Meyer, 868 F.3d 66.[4]

---

[3]     The plaintiffs do not dispute that plaintiff Vicens is bound by the Updated Terms, given that his particular circumstances were not discussed in the plaintiffs' memorandum of law. In any event, Vicens would have received conspicuous notice of the Updated Terms through the Welcome Packet that the defendants allege all new customers received in 2017, and through the billing statements that all of the other plaintiffs received. See Delonge v. Time Warner Cable Bus. LLC, No. 13cv0988, 2014 WL 3890766, at *1-2 (E.D. Wis. Aug. 6, 2014) (discussing the Welcome Packet).

[4]     Although Meyer was decided under California law, "New York and California apply '[s]ubstantially similar rules for determining whether the parties have mutually assented to a contract term.'" Meyer, 868 F.3d at 74 (quoting Schnabel v. Trilegiant Corp., 697 F.3d 110, 119 (2d Cir. 2012)).

In Meyer, the online disclosure of an arbitration agreement gave sufficient notice partially because "the entire screen [was] visible at once, and the user [did] not need to scroll beyond what [was] immediately visible to find notice of the Terms of Service." Id. at 78. Here, the notice provided was also immediately visible on the front page of the billing statement, and the link to the Updated Terms was printed in a regular sized font as opposed to the "small font" of the adequate notice in Meyer. Id.

The plaintiffs attempt instead to liken the Charter notice to the inadequate notice provided in Nicosia v. Amazon.com, Inc., 834 F.3d 220 (2d Cir. 2016). However, the notice of an arbitration provision in Nicosia contained a number of summaries, "between fifteen and twenty-five links," in text of "at least four font sizes and six colors," and several buttons and advertisements. Id. at 237. None of these distracting features were present on Charter's June or July 2017 billing statements.

While the Updated Terms were not physically included with the billing statements, customers had options to access the arbitration provision. The billing statements listed a short address to access the defendants' website, where the Updated Terms were constantly available. See Meyer, 868 F.3d at 78 ("That the Terms of Service were available only by hyperlink

13

does not preclude a determination of reasonable notice."). The billing statements also provided customers with a phone number for ordering a print copy of the Updated Terms.

The Updated Terms themselves also provided sufficient notice of the arbitration provision. The first page of the Updated Terms highlighted the arbitration provision contained within in all capital letters. The arbitration provision itself stood out by including some capital letters, unlike most of the other provisions in the document. See Meyer, 868 F.3d at 79 (finding clear, bolded, reasonably conspicuous instructions were sufficient despite the length of the contract terms).

Subsequently, the plaintiffs manifested their assent to the Updated Terms. They paid their June and July billing statements without objection, and they continued to accept Charter's internet services afterwards. See Sacchi v. Verizon Online LLC, No. 14cv423, 2015 WL 765940, at *8 (S.D.N.Y. Feb. 23, 2015) ("Plaintiff was given explicit notice of the existence of the Amended Agreement . . . and was provided a link to the Amended Agreement. . . . [W]hen Plaintiff continued to use [internet] services after receipt of the notices, [Plaintiff] consented to the terms of the Amended Agreement . . . ."); see also Kurz v. Chase Manhattan Bank USA, N.A., 319 F. Supp. 2d 457, 464-65 (S.D.N.Y. 2004) (holding that a plaintiff had agreed to an arbitration provision by continuing to use credit card services

14

after receiving notice of updated terms in a monthly billing statement and failing to opt out).

Other district courts examining Charter/TWC's billing statements have found this method adequate to create binding updated contractual terms. E.g., Hart, 2017 WL 6942425, at *5; Cova v. Charter Commc'ns, Inc., No. 16cv469, 2017 WL 666097, at *5 (E.D. Mo. Feb. 17, 2017); Delonge, 2014 WL 3890766 at *2; Masters v. Time Warner Cable, Inc., 920 F. Supp. 2d 766, 770-71 (W.D. Tex. 2012).

The plaintiffs argue that these other Charter cases all concerned residential service agreements rather than business service agreements. The plaintiffs insist that Charter's residential agreements "have always been a different animal." Yet the plaintiffs fail to elaborate on the significance of this distinction. If anything, business customers are expected to possess greater sophistication in contract negotiation and understanding. See Warren Elec. Supply Inc. v. Davidson, 727 N.Y.S.2d 502, 502 (App. Div. 2001) (finding a monthly service charge in an agreement's fine print was enforceable for restaurant owners who were presumed to be "sophisticated business persons").

The plaintiffs argue finally that the agreement to arbitrate is unenforceable because Charter induced the

plaintiffs' assent through fraud.[5] The plaintiffs argue that Charter had a motive to convince business class customers to agree to more favorable Updated Terms because Charters' agreements with residential customers were being challenged by the New York Attorney General. See New York by Schneiderman v. Charter Commc'ns, Inc., No. 17cv1428, 2017 WL 1755958, at *1 (S.D.N.Y. Apr. 27, 2017). The plaintiffs' allegations concern the Updated Terms generally.

The plaintiffs' fraud argument has no bearing on their obligation to arbitrate. "[A] party's challenge . . . to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate." Rent-A-Ctr., W., Inc. v. Jackson, 561 U.S. 63, 70 (2010). The plaintiffs have presented no factual allegations to show plausibly that the arbitration provision itself was fraudulently induced. Without specific allegations regarding the arbitration clause, the Court may not delay arbitration in order to consider the plaintiffs' claim of fraud. See Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388

---

[5]      The plaintiffs suggested at oral argument that the Updated Terms were also unconscionable, but conceded that this argument was not raised at any point in their briefing. Therefore, there is no basis in the record to find unconscionability. Moreover, any such argument is forfeited.

U.S. 395, 403-04 (1967).[6] Accordingly, the parties entered into a valid agreement to arbitrate in the Updated Terms.[7]

In any event, the Legacy Terms also provided for arbitration for all of the plaintiffs besides Vicens. The plaintiffs do not allege that they failed to assent to the Legacy Terms. Nor do they allege that such terms were fraudulently induced. The Legacy Terms specifically explained that the arbitration provision would survive termination or expiration of the Legacy Terms. Accordingly, an arbitration provision would remain in effect if the Updated Terms were somehow to be found unenforceable. Therefore, whether under the Updated Terms or the Legacy Terms, the parties entered into valid agreements to arbitrate.

### III.

### A.

Having found agreements to arbitrate, the second step is to determine whether the plaintiffs' claims are arbitrable. "The

---

[6]     The Second Circuit Court of Appeals has emphasized this distinction between a claim of fraud concerning the overall contract and one concerning the arbitration provision. Such a distinction would be "eviscerated if a claimant could transform a general fraud claim into fraud in the inducement of the arbitration clause merely by stating that the arbitration clause is an element of the scheme to defraud." Campaniello Imports, Ltd. v. Saporiti Italia S.p.A., 117 F.3d 655, 667 (2d Cir. 1997).

[7]     The plaintiffs have requested limited discovery regarding their fraudulent inducement claim. However, given that the agreement to arbitrate is enforceable, discovery is unwarranted. The plaintiffs should be able to allege sufficient facts to show that their agreement to each arbitration clause was fraudulently induced if in fact it was fraudulently induced, but they have failed to do so. The plaintiffs cannot avoid arbitration with the unsubstantiated hope that discovery may turn up something.

question whether the parties have submitted a particular dispute to arbitration, i.e., the 'question of arbitrability,' is 'an issue for judicial determination unless the parties clearly and unmistakably provide otherwise.'" Schneider v. Kingdom of Thailand, 688 F.3d 68, 71 (2d Cir. 2012) (quoting Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002)). If "there is 'clear and unmistakable' evidence from the arbitration agreement, as construed by the relevant state law, that the parties intended that the question of arbitrability shall be decided by the arbitrator," then the Court's inquiry ends. PaineWebber Inc. v. Bybyk, 81 F.3d 1193, 1198–99 (2d Cir. 1996) (quoting First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944 (1995)); see also Unique Woodworking, Inc. v. N.Y.C. Dist. Council of Carpenters' Pension Fund, No. 07cv1951, 2007 WL 4267632, at *4 (S.D.N.Y. Nov. 30, 2007).

### B.

The clear and unmistakable terms of the Charter agreements require the arbitrator, not the Court, to determine the scope of arbitration. Both the Updated Terms and the Legacy Terms delegate this authority explicitly. The Updated Terms provide that "all issues are for the arbitrator to decide (including the scope of the arbitration clause)." (Flores Decl., Ex. L.) Similarly, the Legacy Terms provide that "any . . . controversy or claim shall be resolved by binding arbitration" and that "the

18

arbitrability of disputes shall be determined by the arbitrator." (Id. Ex. B.) (capitalization modified). Not only do both of these agreements delegate arbitrability expressly, but they also include the words "any" or "all" that further support the broad authority of the arbitrator. "[A] referral of any and all controversies reflects such a broad grant of power to the arbitrators' as to evidence the parties' clear inten[t] to arbitrate issues of arbitrability." Benihana, Inc. v. Benihana of Tokyo, LLC, 784 F.3d 887, 898 (2d Cir. 2015) (emphasis added) (quoting Shaw Grp. Inc. v. Triplefine Int'l Corp., 322 F.3d 115, 121 (2d Cir. 2003)); accord Hart, 2017 WL 6942425 at *6.

Moreover, both sets of terms also incorporate the AAA Commercial Arbitration Rules that delegate the issue of arbitrability to the arbitrator. Rule 7(a) states that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." AAA Rule R-7(a); see also Contec Corp. v. Remote Sol., Co., 398 F.3d 205, 208 (2d Cir. 2005) (finding that incorporating these rules "serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator"); Pincaro v. Glassdoor, Inc., No. 16cv6870, 2017 WL 4046317, at *7 (S.D.N.Y. Sept. 12, 2017) (collecting cases). Therefore, under either the

Updated or Legacy Terms, the scope of arbitrability must be decided by the arbitrator.[8]

Given this broad delegation, the plaintiffs' remaining arguments concerning arbitrability are for the arbitrator to decide, including the effect of the class action waiver and the degree to which the plaintiffs' "injunctive" claims should be excluded from arbitration. See Henry Schein, Inc. v. Archer & White Sales, Inc., 139 S. Ct. 524, 529 (2019) ("When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract. In those circumstances, a court possesses no power to decide the arbitrability issue. That is true even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless."). Therefore, all of the plaintiffs' claims must be sent to arbitration as provided by the Updated Terms. It is for the arbitrator to decide whether any of the parties' disputes are excluded from arbitration.

## IV.

Both actions are stayed pending arbitration. See Katz v. Cellco P'ship, 794 F.3d 341, 347 (2d Cir. 2015) ("[T]he text,

---

[8] While the arbitration provision of the Legacy Terms covers the plaintiffs' pre-2017 claims, the Updated Terms might also cover them retroactively. All of the plaintiffs' claims arise out of the defendants' uninterrupted internet services. Such "claims arising from or related to conduct occurring before the effective date of an arbitration clause" may still be "within the scope of [that] clause." TradeComet.com LLC v. Google, Inc., 435 F. App'x 31, 34 (2d Cir. 2011) (quotation marks omitted).

structure, and underlying policy of the FAA mandate a stay of proceedings when all of the claims in an action have been referred to arbitration and a stay requested."), cert. denied, 136 S. Ct. 596 (2015); Consol. Precision Prod. Corp. v. Gen. Elec. Co., No. 15cv8721, 2016 WL 2766662, at *7 (S.D.N.Y. May 12, 2016).

## CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. For the reasons explained above, the defendants' motion to compel arbitration is **granted**. Pursuant to 9 U.S.C. §§ 3 and 4, the parties are directed to proceed to arbitration in the manner provided for in the Updated Terms. These cases are **stayed** pending the conclusion of the arbitration. The Clerk of Court is directed to close these cases on the active docket of the Court subject to reinstatement depending on any developments in the arbitration.

**SO ORDERED.**

Dated:    **New York, New York**
            **August 9, 2019**

                                      **John G. Koeltl**
                        **United States District Judge**